**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BIRGIT EHLERS-RENZI; VINCENT
RENZI,
Plaintiffs-Appellees,

v.

CONNELLY SCHOOL OF THE HOLY
CHILD, INCORPORATED,
Defendant-Appellant.

THE AMERICAN JEWISH CONGRESS;
THE BECKET FUND FOR RELIGIOUS
LIBERTY; THE CONVENTION OF THE
PROTESTANT EPISCOPAL CHURCH OF

THE DIOCESEOF WASHINGTON;
GENERAL CONFERENCE CORPORATION
OF SEVENTH-DAY ADVENTISTS;
NATIONAL JEWISH COMMISSIONON
LAW AND PUBLIC POLICY; THE ROMAN
CATHOLIC ARCHDIOCESE OF
WASHINGTON; UNION OF ORTHODOX
JEWISH CONGREGATION OF AMERICA;
AMERICAN CIVIL LIBERTIES UNION OF
MARYLAND; AMERICAN CIVIL
LIBERTIES UNION OF THE NATIONAL
CAPITAL AREA,
Amici Curiae.

No. 99-2352

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
J. Frederick Motz, Chief District Judge.
(CA-99-1512-JFM)

Argued: May 2, 2000

Decided: August 14, 2000

Before WIDENER, MURNAGHAN, and NIEMEYER,
Circuit Judges.

_____

Reversed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Widener joined. Judge Murnaghan wrote a dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** John G. Roberts, Jr., HOGAN & HARTSON, L.L.P.,
Washington, D.C., for Appellant. Vincent D. Renzi, Potomac, Mary-
land, for Appellees. **ON BRIEF:** Gregory G. Garre, HOGAN &
HARTSON, L.L.P., Washington, D.C.; William K. Wilburn, Sara
Beiro Farabow, SEYFARTH, SHAW, FAIRWEATHER & GER-
ALDSON, Washington, D.C., for Appellant. Kevin J. Hasson, Eric
W. Treene, Roman P. Storzer, THE BECKET FUND FOR RELI-
GIOUS LIBERTY, Washington, D.C., for Amici Curiae American
Jewish Congress, et al. Arthur B. Spitzer, AMERICAN CIVIL LIB-
ERTIES UNION OF THE NATIONAL CAPITAL AREA, Washing-
ton, D.C.; Dwight H. Sullivan, AMERICAN CIVIL LIBERTIES
UNION OF MARYLAND, Baltimore, Maryland, for Amici Curiae
Unions.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Birgit Ehlers-Renzi and her husband, Vincent Renzi, Montgomery
County, Maryland, homeowners who live across from a Roman Cath-
olic school which is constructing improvements and additions to the
school without obtaining a "special exception," challenge the consti-
tutionality of Montgomery County Zoning Ordinance § 59-G-2.19(c),
which exempts such schools from the special exception requirement.
The Renzis contend that the ordinance violates the Establishment

2

Clause of the First Amendment, as applied to the States through the Fourteenth Amendment.

The district court, agreeing with the Renzis, declared the ordinance unconstitutional and enjoined the school from continuing construction, except to complete a parking lot and sediment pond, on which construction had already begun. For the reasons that follow, we reverse.

I

The Connelly School of the Holy Child, Inc. ("Connelly School") operates a non-profit, college-preparatory school for young women in grades 6 through 12, under the auspices of the Roman Catholic Church. In the school, according to its catalog,"Christian values are not only taught in the classroom but put into practice," and students are required to take religion courses and attend masses. Connelly School opened in 1961 and is situated on ten acres of land on Bradley Boulevard in Potomac, Maryland. The school and the land are owned by the Society of the Holy Child Jesus, Inc., a Pennsylvania corporation, which also operates under the auspices of the Roman Catholic Church. The school, which had an enrollment of 413 students during the 1999-2000 academic year, operates from a large main building, two modular classrooms located in trailers, and a home with an attached chapel. The property also includes athletic fields and parking lots.

After initiating a fund-raising campaign and hiring an architectural firm, Connelly School finalized plans to remove two existing structures, as well as the trailers, and to construct a 30,000 square-foot, two-story building to contain classrooms, a library, facilities for music and art programs, and other educational areas. The plans also provide for the construction of additional parking areas.

Before beginning construction, Connelly School informed neighboring landowners that it would not seek a special exception for its construction plans because § 59-G-2.19(c) of the Montgomery County Zoning Ordinance ("Zoning Ordinance") exempts from the special exception requirement parochial schools located on land owned or leased by a church or religious organization. After receiving

3

that notice, the Renzis, who live across the street from Connelly School, requested that Montgomery County determine whether Connelly School was indeed exempt from the requirement to obtain a special exception. When the County ruled that Connelly School was exempt from the special exception requirement, the Renzis filed an administrative appeal with the Montgomery County Board of Appeals. They subsequently withdrew that appeal, however, and instead filed this action for a declaratory judgment and injunctive relief, alleging that the exemption and the school's reliance on the exemption violate the Establishment Clause of the First Amendment.

On cross-motions for summary judgment, the district court ruled that Zoning Ordinance § 59-G-2.19(c) violated the Establishment Clause. See Renzi v. Connelly Sch. of the Holy Child, Inc., 61 F. Supp. 2d 440 (D. Md. 1999). Applying the test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971), the court determined that the exemption in the Zoning Ordinance did not have a secular legislative purpose, rejecting Connelly School's argument that it encouraged the private use of under-utilized public-school facilities, promoted education, and alleviated governmental interference with religion. The court reasoned that even if the exemption did minimize such interference, "that purpose would be constitutionally insufficient" because it is "wholly conjectural and does not relate to any identified risk of `significant' governmental interference with religious affairs." The district court also ruled that the exemption impermissibly advanced religion because it allowed religious schools to escape the density restrictions in the Zoning Ordinance that were applicable to secular schools and thereby more easily increase their enrollment and fulfill their financial obligations.

This appeal followed.

II

The Montgomery County Zoning Ordinance ordinarily requires private educational institutions and other nonresidential uses in residential areas to obtain a "special exception" before constructing improvements and additions, such as those planned by Connelly School. Zoning Ordinance § 59-C-1.31. To obtain a special exception, a private school is required to file a petition containing specified

4

information, including a statement explaining "in detail how the special exception is proposed to be operated," and supported by a plat, drawings, and a site plan for the proposed construction. Id. §§ 59-A-4.22(a), 59-G-2.19(b). The petition may be granted only after public notice and hearing, see id. § 59-A-4.41(a), during which residents may testify on the petition, and the Board of Appeals may grant a special exception petition only if it finds that the private school's use "will not constitute a nuisance"; that it will be "housed in buildings architecturally compatible with other buildings in the surrounding neighborhood"; that it will not "affect adversely or change the present character or future development of the surrounding residential community"; and that it "can and will be developed in conformity with" various specified requirements, id. § 59-G-2.19(a). The Zoning Ordinance provides, in addition, that the special exception use must be inspected annually for compliance with restrictions imposed in connection with the special exception, that the special exception holder must respond to any ongoing complaints of noncompliance, and that the special exception use is subject to revocation. See id. § 59-G-1.3(a), (b), (e).

The requirement to obtain a special exception, however, does not apply to all nonresidential uses. In particular, Zoning Ordinance § 59-G-2.19(c) provides the following exemption:

> The requirements of this section shall not apply to the use of any lot, lots or tract of land for any private educational institution, or parochial school, which is located in a building or on premises owned or leased by any church or religious organization, the government of the United States, the State of Maryland or any agency thereof, Montgomery County or any incorporated village or town within Montgomery County.

While Zoning Ordinance § 59-G-2.19(c) exempts from the special exception requirement private schools located on property owned or leased either by the national, state, or local government or by a church or religious organization, it is the portion exempting a "parochial school, which is located in a building or on premises owned or leased by any church or religious organization" that the Renzis challenge as improperly establishing religion.

5

Connelly School argues that the exemption created by Zoning Ordinance § 59-G-2.19(c) represents an appropriate effort by Montgomery County to accommodate religion "by simply excusing religiously-affiliated entities from regulatory burdens placed on others." It maintains that the exemption's purpose is to alleviate government interference with the ability of religious organizations to fulfill their religious missions; that its effect is to "make it easier" for religious organizations to advance religion; and that it avoids the entanglement "that would follow from subjecting religious schools to the special exception process."

The Renzis contend, on the other hand, that Zoning Ordinance § 59-G-2.19(c) evinces no secular legislative purpose and that it does not "remove a burden from the free exercise of religion" as required for Connelly School's "'accommodation of religion' argument." They argue that the exemption also indirectly aids religion. While they acknowledge that such aid is permissible if it arises from a neutral and generally applicable law, they maintain that it is impermissible when it "only benefits religious landowners." Finally, the Renzis argue that Zoning Ordinance § 59-G-2.19(c) fosters excessive government entanglement with religion because it "is likely to cause or intensify political fragmentation and divisiveness along religious lines."

We are thus confronted with the question of whether exempting a parochial school from the procedures and restrictions otherwise required to obtain a special exception in Montgomery County violates the Establishment Clause of the First Amendment.

III

The Establishment Clause prohibits Congress and, through the Fourteenth Amendment, the States from making any law "respecting an establishment of religion." U.S. Const. amend. I; see also Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940). "Establishment" connotes "sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970). But recognizing that "this Nation's history has not been one of entirely sanitized separation between Church and State," the Supreme Court has noted that it "has never been thought either possible or desirable to enforce a regime of total separation." Committee

6

for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760 (1973). Thus, the principle is "fixed" that a government program or law "which in some manner aids an institution with a religious affiliation" does not, for that reason alone, violate the Establishment Clause. Mueller v. Allen, 463 U.S. 388, 393 (1983).

But the prohibition against the establishment of religion does require government neutrality toward religion and among religions. See Rosenberger v. Rector & Visitors of Univ. of Va. , 515 U.S. 819, 839 (1995); Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 696 (1994) (opinion of Souter, J.). And this neutrality may be a "benevolent neutrality." Walz, 397 U.S. at 669. Indeed, the government is entitled to accommodate religion without violating the Establishment Clause, and at times the government must do so. See Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 338 (1987) (The Establishment Clause provides "ample room for accommodation of religion"); Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 144 (1987) ("[T]he government may (and sometimes must) accommodate religious practices"); Lynch v. Donnelly, 465 U.S. 668, 673 (1984) (The Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions"). The limits of this accommodation by government are not "co-extensive with the noninterference mandated by the Free Exercise Clause." Amos , 483 U.S. at 334 (quoting Walz, 397 U.S. at 673).

This authorized, and sometimes mandatory, accommodation of religion is a necessary aspect of the Establishment Clause jurisprudence because, without it, government would find itself effectively and unconstitutionally promoting the absence of religion over its practice. See Lynch, 465 U.S. at 673 ("Anything less would require the `callous indifference' we have said was never intended by the Establishment Clause"); School Dist. of Abington Township v. Schempp, 374 U.S. 203, 225 (1963) ("[T]he State may not establish a `religion of secularism' in the sense of affirmatively opposing or showing hostility to religion"); Zorach v. Clauson, 343 U.S. 306, 314 (1952) (To hold that the government may not "respect[ ] the religious nature of our people and accommodate[ ] the public service to their spiritual needs" would be to "prefer[ ] those who believe in no religion over those who do believe").

7

The line between benevolent neutrality and permissible accommodation, on the one hand, and improper sponsorship or interference, on the other, must be delicately drawn both to protect the free exercise of religion and to prohibit its establishment. In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court articulated a test for drawing that line, a test that has since been frequently criticized in its application.* See, e.g., Michael W. McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 118 (1992) (in the Lemon test, "the Court has contrived a formula for interpreting the Establishment Clause that contains inconsistencies within a single test"). And while cases since Lemon continue to apply and adapt the test to various circumstances, see, e.g., Mitchell v. Helms, 120 S. Ct. 2530, 2540 (2000) (plurality opinion) (recognizing that the Lemon test has been "recast" and "modified . . . for purposes of evaluating aid to schools"), it has not been overruled, see Koenick v. Felton, 190 F.3d 259, 265 (4th Cir. 1999) ("[T]he general principles we have relied on to evaluate Establishment Clause claims have not substantively changed since the Lemon line of cases was decided"). Under Lemon, for a legislative act to withstand an Establishment Clause challenge, (1) it must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive governmental entanglement with religion. See 403 U.S. at 612-13. While the Lemon test thus provides "helpful signposts" for analyzing Establishment Clause challenges, Hunt v. McNair, 413 U.S. 734, 741 (1973); Mueller, 463 U.S. at 394, the structure for its application to a religious exemption, such as that before us in this case, is more clearly provided by Amos, where the Court held that the exemption of religious organizations from the prohibition against religious discrimination in employment of Title VII of the Civil Rights Act of 1964 does not improperly establish religion in violation of the First Amendment. See Amos, 483 U.S. at 339-40. Accordingly, we now apply the Lemon test as refined in Amos to analyze the exemption of

_____

*This criticism has come even from members of the Supreme Court. See, e.g., Kiryas Joel, 512 U.S. at 718-19 (O'Connor, J., concurring); id. at 750-51 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 398-400 (1993) (Scalia, J., concurring in the judgment, joined by Thomas, J.); Wallace v. Jaffree, 472 U.S. 38, 68-69 (1985) (O'Connor, J., concurring in the judgment).

religious organizations from the requirements imposed by the Montgomery County Zoning Ordinance.

IV

Under the first of Lemon's three prongs, we ask whether Zoning Ordinance § 59-G-2.19(c) has a "secular legislative purpose." Lemon, 403 U.S. at 612. And as refined in Amos for statutory exemptions, we determine whether the government has "abandon[ed] neutrality and act[ed] with the intent of promoting a particular point of view in religious matters." Amos, 483 U.S. at 335. This secular purpose prong presents a "fairly low hurdle," Barghout v. Bureau of Kosher Meat & Food Control, 66 F.3d 1337, 1345 (4th Cir. 1995), which may be cleared by finding "a plausible secular purpose" on the face of the regulation, Mueller, 463 U.S. at 394-95.

Connelly School advances several plausible secular purposes revealed by the Montgomery County Zoning Ordinance. It notes that by exempting parochial schools from the special exception procedure, Montgomery County avoids the interference with such schools' religious missions that otherwise might result from subjecting the schools to the scrutiny and procedures that the Zoning Ordinance otherwise would require. Connelly School also notes that by"stepp[ing] out of the way of religion," the County avoids the creation of a forum in which anti-religious animus underlying opposition to a special exception petition might be expressed. These purposes are indeed plausibly evident on the face of the ordinance and have been found valid in analogous contexts by the Supreme Court in Amos and by this court in Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church, 846 F.2d 260, 263-64 (4th Cir. 1988) (upholding exemption for religious daycare centers from licensing requirements). See also Walz, 397 U.S. at 673 ("Grants of exemption historically guard against the danger of hostility toward religion").

In Amos, the Supreme Court applied Lemon 's first prong to an exemption in Title VII of the Civil Rights Act of 1964 that permitted religious organizations to discriminate in employment on the basis of religion. The Court found that the exemption served a permissible secular purpose because it "alleviate[d] significant governmental interference with the ability of religious organizations to define and

9

carry out their religious missions." Amos, 483 U.S. at 335. This same reasoning applies to the exemption contained in Zoning Ordinance § 59-G-2.19(c). This exemption spares Connelly School from the rigorous review of numerous subjective factors that otherwise could interfere with implementation of its mission. The exemption from the special exception requirement relieves Connelly School from having to justify its religious or religion-related needs before civil authorities and convince those authorities that the school's renovations and additions satisfy such subjective requirements as, for example, "architectural[ ] compatib[ility]" or conformity with "the present character . . . of the community." Would a cross on a building offend citizens in the neighborhood? Would Gothic windows offend a neighborhood that was determined to maintain an American colonial style? Would a chapel or chapel bell or chapel organ offend? The exemption also extricates Montgomery County from the resolution of disputes that could have a religious underpinning. Would citizen challenges actually be cloaking anti-religion or anti-denomination animosity? In short, the low threshold of this first Lemon prong is readily cleared by the Zoning Ordinance's plausible purpose of extricating Montgomery County from these involvements in religion.

We reached the same conclusion in Forest Hills , in which we upheld an exemption of religious daycare centers from licensing requirements. We concluded that the exemption had the legitimate secular purpose of "avoid[ing] interference with the execution of religious missions in a nonprofit area in which a church operates" and thereby "prevent[ing] state interference with church programs that provide education and care for children," even though the instruction at the daycare centers may not have been explicitly religious. Forest Hills, 846 F.2d at 263-64.

When confronted with a similar circumstance, the Seventh Circuit reached a similar conclusion in Cohen v. City of Des Plaines, 8 F.3d 484 (7th Cir. 1993), where it rejected a constitutional challenge to a zoning ordinance exempting church daycare centers from the requirement of obtaining a special use permit. Even though the exemption applied to daycare centers operated in churches irrespective of whether they provided religious instruction, the court held that it had "the secular purpose of minimizing governmental meddling in religious affairs notwithstanding that [it] does not explicitly state that

10

[daycare centers] operated in churches in residential areas must give care or instruction defined as `religious.'" Cohen, 8 F.3d at 491.

The Renzis urge that we reject the applicability of these precedents to this case, arguing that Zoning Ordinance § 59-G-2.19(c) reveals no secular purpose on its face because the literal language of the exemption reaches not only parochial schools but also any other private school that happens to be located on land owned by a religious organization. They argue that the breadth of this exemption belies any purpose to extricate Montgomery County from religious matters but rather indicates a purpose to favor religious landowners. In support of this argument, they conjure up hypotheticals involving use of the exemption by secular entities, such as a cosmetology school, that operate on land owned by a church. This argument fails on two levels.

First, it must be recognized that the Renzis are challenging the utilization of the exemption by a Roman Catholic school to construct improvements and additions to a school located on property owned by a corporation operated under the auspices of the Roman Catholic Church. Thus, we do not have before us any of the hypothetical situations advanced by the Renzis. The Renzis respond by noting that they styled their action as a facial challenge and that therefore they may argue the constitutionality of the Zoning Ordinance under any hypothetical set of circumstances. But their standing derives from their status as neighbors challenging the particular improvements and additions being constructed by Connelly School, a religious school operated on property owned by a religious organization. The "traditional rule" is that one "to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court." Los Angeles Police Dep't v. United Reported Publishing Corp., 120 S. Ct. 483, 489 (1999) (quoting New York v. Farber, 458 U.S. 747, 767 (1982)); Tilton v. Richardson, 403 U.S. 672, 682 (1971) (plurality opinion) (under the Establishment Clause, "[w]e cannot . . . strike down an Act of Congress on the basis of a hypothetical `profile'" of a party not before the court).

Second, even if we look beyond the scope of the Renzis' challenge against Connelly School in this case, the possibility that the exemption would be applied in a completely areligious setting is remote.

11

The Zoning Ordinance does not exempt landowners but rather school uses. Thus, the ordinance exempts any private school located on property owned by a religious organization. Whether the school is denominated parochial or nonsectarian, the inquiry into the school's operation and its relationship to religion would risk the same religious entanglement. Because of this risk, in Forest Hills we expressly disavowed any inquiry into whether the activities undertaken by religious organizations were actually religious and we rejected the argument that an exemption for a religious organization is valid only if it performs a demonstrably religious function. See 846 F.2d at 263; see also Amos, 483 U.S. at 336 ("[I]t is a significant burden on a religious organization to require it . . . to predict which of its activities a secular court will consider religious"); Cohen, 8 F.3d at 490 ("It is not up to legislatures (or to courts for that matter) to say what activities are sufficiently `religious'"). As James Madison put it in his Memorial and Remonstrance Against Religious Assessments of 1786, such an inquiry would "impl[y] . . . that the civil magistrate is a competent judge of religious truth," which is "an arrogant pretension." The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 48 (Neil H. Cogan ed. 1997). Because the exemption applies to any private school located on land owned by a religious organization, religion is the defining aspect of the exemption, and we therefore believe that the exemption plausibly aims to alleviate government interference with religion.

At bottom, the exemption at issue in this case frees Connelly School from obtaining a special exception only because the school has a religious connection. The very existence of the school is premised on a religious mission. See Walz, 397 U.S. at 671 ("[T]o assure future adherents of a particular faith" is "an affirmative if not dominant policy of church schools"). And necessary to the fulfillment of this mission is the existence of facilities which Connelly School deems adequate to carry on its religious instruction. An official of the school stated this explicitly, averring that the school "needs to renovate in order to meet the educational and religious mission of the Roman Catholic Church, the Society [of the Holy Child Jesus], and the School." By removing the requirement to obtain a special exception, Montgomery County not only lifts a burden from the school's exercise of religion but also extricates itself from potential interference with the school's religious mission.

12

The second prong of the Lemon test prompts inquiry into whether the statutory exemption has a "principal or primary effect" that "neither advances nor inhibits religion." 403 U.S. at 612. The Renzis argue that the exemption impermissibly advances religion by "providing religious organizations an exclusive benefit." While Connelly School acknowledges that Zoning Ordinance § 59-G-2.19(c) "may well indirectly promote the ability of religious organizations to carry out their own religious mission through the operation of the schools located on their property," it argues that the Establishment Clause only forbids advancement of religion by the government itself.

An exemption's effect of simply allowing a religious school to "better . . . advance [its] purposes" does not rise to a constitutionally prohibited magnitude. Amos, 483 U.S. at 336; see also Mueller, 463 U.S. at 393. An unconstitutional effect occurs when "the government itself has advanced religion through its own activities and influence." Amos, 483 U.S. at 337. In Forest Hills, we applied Amos to uphold a law that "adopt[ed] a hands-off policy" in order to permit religious organizations "to advance their own teachings." Forest Hills, 846 F.2d at 263. Similarly, in this case, Montgomery County has relieved religious schools of the administrative burden of pursuing the special exception procedure. Any advancement of religion that follows would be the result of the religious schools' own acts in light of the exemption, as opposed to Montgomery County's elimination of an otherwise applicable requirement. See Cohen, 8 F.3d at 492 ("The religious component of child care and education activities in [the city] will come from church members or leaders, not from government officials"); cf. Mitchell, 120 S. Ct. at 2540 (plurality opinion) (examining, in the context of aid to schools, "whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action"). Thus, when the district court in this case observed that Zoning Ordinance § 59-G-2.19(c) would advantage Connelly School over "non-profit nonsectarian private schools" by exempting Connelly School from density restrictions, it identified a potential benefit resulting from Connelly School's enrollment policy and attraction of students, not from Montgomery County's policy of non-interference. See Walz, 397 U.S. at 658 (identifying sponsorship, support, or involvement of the government in religion as the concerns of the Establishment Clause). Echoing Amos, "we do not see how any advancement of religion" that is achieved by Connelly School "can be

13

fairly attributed to [Montgomery County], as opposed to the Church." <u>Amos</u>, 483 U.S. at 337.

Finally, Zoning Ordinance § 59-G-2.19(c) plainly satisfies <u>Lemon</u>'s third requirement that it not "foster `an excessive entanglement with religion.'" 403 U.S. at 613 (quoting <u>Walz</u>, 397 U.S. at 674). Indeed, the parties appear to agree that it has a disentangling aspect, avoiding governmental intrusion into matters of religious education. <u>See Amos</u>, 483 U.S. at 339 ("It cannot be seriously contended that [the challenged act] impermissibly entangles church and state; the statute effectuates a more complete separation of the two and avoids . . . [an] intrusive inquiry into religious belief"); <u>Cohen</u>, 8 F.3d at 493. While the Renzis rely on language in <u>Lemon</u> to argue that the exemption presents "divisive political potential," 403 U.S. at 622, the Supreme Court subsequently confined this <u>Lemon</u> entanglement test to "cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools," <u>Mueller</u>, 463 U.S. at 403-04 n.11.

V

Religion and the State wisely function in different arenas, but the people attending each arena are the same. Keeping religion and State distinct, while at the same time protecting the freedom of the people to act fully in both arenas, requires the State to recognize and even interact with religion, but not to manage or incorporate the religious arena itself by favoring religion over non-religion, by favoring non-religion over religion, by favoring one religion over another, or by distinguishing among religions. The State does not engage in any of these establishment activities when it exempts religious institutions from land-use regulations. Rather, such an exemption removes the State from forums in which religious conflict might otherwise require improper State action.

By providing an exemption to parochial schools or to any private school on property owned by a religious organization, Montgomery County has permissibly accommodated religion by allowing these schools to operate or renovate their facilities without obtaining a special exception. We plow no new ground in reaching this conclusion, which follows ineluctably from the holdings in <u>Amos</u>, <u>Forest Hills</u>, and <u>Cohen</u>.

14

Accordingly, we hold that Zoning Ordinance § 59-G-2.19(c) does not violate the Establishment Clause of the First Amendment, and the judgment of the district court is therefore

REVERSED.

MURNAGHAN, Circuit Judge, dissenting:

The natural tension that exists between the Establishment and Free Exercise Clauses of the First Amendment requires that delicate lines be drawn. Although I agree with the analytical approach taken by the majority, I disagree with where they have drawn the line in this case. Because I do not agree that Montgomery County Zoning Ordinance § 59-G-2.19(c) is a permissible accommodation of religion, I conclude that it violates the Establishment Clause of the First Amendment and, accordingly, I dissent.

Relying on the rationale of Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987), the majority concludes that Montgomery County Zoning Ordinance § 59-G-2.19(c) passes the first prong of the test laid out in Lemon v. Kurtzman, 403 U.S. 602 (1971), because it has a legitimate secular purpose: to alleviate "significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Amos, 483 U.S. at 335. Specifically, the majority found that the challenged ordinance "spares Connelly School from the rigorous review of numerous subjective factors that otherwise could interfere with implementation of its mission." (Ante at 10).

I disagree. Application of the County's special exception procedures to the Connelly School would not significantly interfere with the school's ability to define and carry out its mission. There is no danger that Montgomery County will become involved in regulating the school's program of religious education by simply enforcing the generally applicable zoning rules and special exception procedures at issue in this case. The special exception procedures do not burden the exercise of religion in the same way or to the same degree as did the employee hiring requirements at issue in Amos or the daycare program regulations at issue in Forest Hills Early Learning Center v. Grace Baptist Church, 846 F.2d 260 (4th Cir. 1988). There is an

15

important difference between regulations that reach into an organization's program and personnel, on the one hand, and those that only impact the development of its physical facilities, on the other. What goes on within the walls of the church buildings is of far greater significance than the configuration of those buildings. By failing to draw a meaningful line between "significant" and "incidental" interference with religious institutions, I fear the majority is inappropriately expanding the Amos principle and, as a result, traveling down a path that will ultimately render the Establishment Clause meaningless.

I find further support for my conclusion that the challenged ordinance does not serve the secular purpose of avoiding governmental interference with the church's mission in the language of the ordinance itself. On its face, County Zoning Ordinance§ 59-G-2.19(c) applies not only to religious schools, but also to secular schools operated on property owned or leased by religious institutions. If the ordinance were a legitimate effort to avoid interference with the mission of religious schools, it would not be written so as to extend its benefits to schools that are not engaged in any sort of religious mission. The overinclusive language of the ordinance belies the legislative purpose accepted by the majority. For both of these reasons, therefore, I conclude that County Zoning Ordinance § 59-G-2.19(c) was not enacted with the legitimate secular purpose of avoiding governmental interference with the free exercise of religion.

In Amos, the Supreme Court marked a path for legislative actions which relieve religious institutions from generally applicable regulatory burdens in order to better accommodate the free exercise of religion. This court followed that path in Forest Hills by upholding a legislative exemption in Virginia which relieves religiously affiliated daycare centers from the burdens of licensing requirements applied to secular daycare facilities. In both Amos and Forest Hills, one can easily discern a genuine effort to allow religious institutions to operate programs and thereby fulfill their missions without significant, substantive interference from the government. In this case, however, I do not see any such genuine effort. Instead, I see something that looks very much like ordinary favoritism for religious property owners in Montgomery County. Because I believe that such favoritism is precisely what the Establishment Clause forbids, I would hold that Montgomery County Zoning Ordinance § 59-G-2.19(c) is invalid.

16