[745 NYS2d 183]

In the Matter of Edward S. Gordon et al., Respondents, v Edward T. Rush et al., Appellants, et al., Respondent.

Second Department, June 24, 2002

### APPEARANCES OF COUNSEL

*Sive, Paget & Riesel, P.C.,* New York City (*Eric Bregman, Mark A. Chertok* and *Elizabeth Read* of counsel), and *David Gilmartin, Town Attorney,* Southampton, for appellants.

*Esseks, Hefter & Angel,* Riverhead (*William W. Esseks* and *Anthony C. Pasca* of counsel), for respondents.

### OPINION OF THE COURT

SMITH, J.P.

The petitioners are owners of various properties which are located in the Town of Southampton, Suffolk County, and border the Atlantic Ocean shoreline. The petitioners are private residential landowners as well as the Bridgehampton Tennis and Surf Club, a private recreational facility. Coastal erosion is a significant concern for the private residential and recreational landowners in that locale. To that end, the Town Board of the Town of Southampton enacted its Coastal Erosion Hazard Area Law (hereinafter CEHL) to implement and administer a coastal erosion management program in 1988, pursuant to ECL article 34.

In March 1993, the petitioners, in response to concentrated erosion along the shoreline of their properties resulting from significant storms in December 1992 and March 1993, notified the Town of their intention to install steel bulkheads along thousands of feet of beachfront on the Atlantic Ocean. The CEHL had delegated limited authority to issue permits to the Southampton Coastal Erosion Hazard Area Administrator (hereinafter the Administrator). Variances under the CEHL

were issued by the Coastal Erosion Hazard Board of Review of the Town of Southampton (hereinafter the Board), and the Board is comprised solely of the Town of Southampton Zoning Board of Appeals (hereinafter the ZBA).

Originally the petitioners asked that the bulkheads be undertaken as an emergency measure, but the Administrator concluded that, inter alia, because of the extensive nature of the project, the potential effects it might have on adjacent properties, and the number of petitioners involved, the general review standards of the CEHL would be followed. In that vein, the petitioners submitted applications for CEHL permits as well as permits from the New York State Department of Environmental Conservation (hereinafter the DEC), as required by the Tidal Wetlands Law contained in ECL article 25. In the original application, the petitioners sought to build bulkheads consisting of 30-foot high interlocking steel sheeting, 18 feet of which would be driven underground. Additionally, numerous boulders varying in weight between two and five tons, would be placed in front of the steel sheeting up to a height of six feet above ground. These bulkheads would be located seaward of the crest of the primary dune and were intended to be covered by sand.

The review of the project pursuant to the State Environmental Quality Review Act (ECL article 8 [hereinafter SEQRA]) commenced after the filing of the applications. In a letter to the DEC dated April 2, 1993, the Administrator advised the DEC that the Town Building Department did not want to act as the lead agency for the coordinated review of the proposed projects pursuant to SEQRA, and requested that the DEC consider assuming the role. In the letter, the Administrator also indicated that the Town Building Department had preliminarily classified the action as an unlisted action pursuant to 6 NYCRR 617.2 (ak), that the impacts from the projects "transcend[ed] local significance," and that the DEC had a "greater capability for providing the most thorough environmental assessment of the proposed action." The DEC responded in a letter dated April 14, 1993, that it would assume lead agency status for this action and that it had classified the project as an unlisted action for SEQRA review purposes. Both the Southampton Board of Trustees and the Administrator subsequently advised the DEC that there were no objections to its assumption of lead agency status by letters dated April 20, 1993, and May 6, 1993, respectively.

Consequently, the DEC acted as lead agency and was instructed to keep the Administrator informed of the DEC's

review of the permit applications. The Administrator had contacted the petitioners by letter dated May 7, 1993, informing them that the DEC would be the lead agency in this coordinated review. This was considered a coordinated review because both the DEC and the Board had jurisdiction over the proposed project and as such, were involved agencies under SEQRA (see 6 NYCRR 617.2 [5]; 617.6 [b] [3]). The DEC had jurisdiction because of the seaward location of the proposed bulkheads. Because these proposed bulkheads were to be on the seaward side, no variances under the CEHL were required. Nevertheless, the Administrator advised the petitioners through a series of individualized letters that he would not issue any decisions regarding the applications until the DEC issued either a negative declaration or had filed a final Environmental Impact Statement (hereinafter EIS) and written findings.

By letter dated June 7, 1993, the DEC advised the petitioners that it intended to issue a positive declaration because the projects, as they stood, may result in the narrowing or even loss of the beach. As a result, the DEC was requiring a draft EIS intended to address this concern and to possibly consider and evaluate alternatives. However, the DEC also advised the petitioners, in the course of this letter, that if they changed their project design by incorporating mitigative features, the DEC might not require a draft EIS. Among the mitigating features suggested by the DEC was the placement of the bulkheads as far landward as possible and, in any case, landward of the landward toe of the primary dune. Both the Administrator and the Board were copied into this correspondence.

In response to the DEC's letter of June 7, 1993, the petitioners submitted modifications to their original proposals. They agreed to relocate the steel bulkheads behind and within the primary dune, as well as some other modifications which the DEC had suggested. On August 19, 1993, the DEC, as lead agency, issued a negative declaration concluding that the projects, as modified, would not have a significant effect on the environment. This declaration was conditioned on a requirement that the petitioners restore the dune prior to the initial installation of the bulkheads and perform periodic maintenance as needed. The DEC listed six specific supporting reasons for the negative declaration. On September 13, 1993, the DEC issued tidal wetlands permits to the petitioners.

The day after the DEC issued the negative declaration, they forwarded a copy to the Administrator. Two weeks later, the

Town Attorney wrote the petitioners that the fact that they had acquired the DEC permits, did not obviate the fact that they also needed approval from the Town Building Department, especially in light of the vastly modified proposal. In response, the petitioners submitted a request for coastal erosion hazard area (hereinafter CEHA) permits for the projects that had received the negative declaration. On October 1, 1993, the Administrator denied the CEHA permits citing that the "structures" were not permitted on the landward toe of the dune but only, if at all, on the "waterward" toe of the dunes. The petitioners appealed the denial of their permits to the Board. After conducting a public hearing, the Board issued a decision on February 17, 1994, in which it announced that it would conduct a new SEQRA review, establish a lead agency to do so, treat the project as a Type I action, and proceed to make a determination of significance on the application.

The petitioners responded by commencing a CPLR article 78 proceeding in the Supreme Court, Suffolk County, entitled *Matter of Gordon v Matthews* under Index No. 94-05867, in which they sought, inter alia, to annul the Board's determination dated February 17, 1994, enjoin the Board from taking any further action under SEQRA, and compel the Board to proceed with the petitioners' appeal from the Administrator's determination that a variance was needed. The Supreme Court issued a judgment in that matter on August 29, 1994. The court, inter alia, annulled the Board's February 17, 1994, determination, concluding that the Board did not have jurisdiction to conduct a SEQRA review and also compelled the Board to entertain the petitioners' appeal. The court further stated that the Board had CEHA jurisdiction over the project. Neither party appealed from this judgment.

Following the *Matthews* decision, the Board conducted a series of public hearings on this matter between September and December 1994. A number of expert witnesses testified concerning the possible effects that the bulkheads would have on the shoreline and the adjoining area. The DEC reiterated that it had complied with state law and SEQRA regulations when it had issued the initial negative declaration, and would not have issued the negative declaration or the tidal wetlands permits had there been a problem. Additionally, the DEC's author of the model CEHA indicated that any literal prohibition against the placement of structures on the landward toe of the dune was unintentional.

The Board issued its decision on remand on January 19, 1995. The Board affirmed the Administrator's determination

that the proposed structures were not permitted by the CEHL without a variance, and resolved to proceed with the variance applications as expressly requested by the petitioners. The Board also, for the first time, issued a positive declaration, essentially finding that the DEC's negative declaration was not binding on it, so that it would perform its own SEQRA review as lead agency. In that capacity, the Board required the petitioners to prepare an EIS. In pronouncing the positive declaration, the Board wrote,

> "[T]he installation of structural shore protection measures on the properties in question may have significant adverse environmental effects by interfering with natural beach and dune processes, and putting public beach rights, ocean fronting property interests and shellfish resources at risk.
>
> "While the evidence encompassed a broad range of subjects, including shoreline recession rates, beach stability, water levels, dune restoration and maintenance, revetments and shore-hardening structures in other locations, and history of storms along the Long Island coastline, this Board finds much of the evidence conflicting or inconclusive. Accordingly, we are constrained to request an environmental impact study on the issues addressed in this determination."

By petition dated January 24, 1995, the petitioners commenced the subject proceeding pursuant to CPLR article 78. In the petition they sought, inter alia, determinations that (1) the Board's January 19, 1995, resolutions were null and void, (2) the DEC's negative declaration was binding on the Board, and (3) the Board could not proceed with its own SEQRA review. In support of the petition, the petitioners noted that one of the Board's own experts had concluded that the proposed projects would either have no adverse environmental impact or no significant impact. To the contrary, this expert had maintained that because the petitioners would be obligated to restore dunes and the subsequent storms would spread sand out over the beach, the adjacent landowners would actually benefit from the proposal. The report of this expert was only provided to the petitioners after they had petitioned the court for its release. The petitioners continued that the DEC's coordinated review as the lead agency resulting in the negative declaration, ended the environmental review of this project. The petitioners also

contended that the DEC could act as lead agency and it was not divested of jurisdiction because portions of the modified project had remained within the tidal wetlands.

The Board responded by moving to dismiss the proceeding on the grounds that (1) the substance of the petition was not ripe for judicial review because the Board's issuance of a positive declaration did not constitute a final administrative action resulting in an injury to the petitioners as required, and (2) the principle of res judicata prohibited the court from restricting the Board's own SEQRA review because the court had previously allowed it in the earlier *Matthews* case. On the merits, the Board argued that (1) the negative declaration was not the result of a proper coordinated review under SEQRA and therefore, the Board was required to conduct an environmental review of the petitioners' variance application, (2) the Board properly interpreted the CEHL to determine that petitioners' modified projects required a variance, (3) the petitioners' variance requests were not Type II Actions, and thus were subject to SEQRA, and (4) the Board's positive declaration was amply supported by the record, which demonstrated significant potential adverse environmental impacts. The Board also sought dismissal of the petition on the ground of mootness.

### The Judgment Appealed From:

The Supreme Court issued its decision on May 22, 2000, and a judgment was entered on August 2, 2000. In the decision, the court initially rejected the Board's argument that subsequent natural events had rendered the proceeding moot. The court noted that the events actually confirmed that the bulkheads would have operated precisely as the DEC had indicated because, although there were severe storms in the winter of 1997-1998, only two of the structures would have been exposed and that many of the dunes were restored by natural processes between 1993 and 1999. The court also noted that if the dune restorations became unsuccessful, the petitioners remained obligated to remove the bulkheads. Further, the Supreme Court rejected the Board's ripeness and res judicata arguments. In regard to the ripeness issue, the court concluded that because extensive hearings had been held concerning the bulkheads and their possible environmental impact, a sufficient record had been established rendering this issue ripe for review. Additionally, the court held that this matter was ripe because the issue being challenged was which body was going to act as the

lead agency in the SEQRA review. Regarding the res judicata claim, the court noted that in the earlier *Matthews* decision, the court therein annulled the Board's decision and remitted the matter to the Board precisely because the record regarding the Board's jurisdiction to conduct its own SEQRA review had not been fully developed.

The court addressed the merits of the petition and in doing so, held that the Board's determination was null and void. Initially, the Supreme Court reviewed the pertinent principles and purposes of SEQRA. Next, the Supreme Court stressed the purpose of a coordinated review of a project, and ultimately, the binding effect of a lead agency's determination of significance on all interested agencies. The Supreme Court specifically rejected the Board's contention that the modification of the project transformed them into new applications, subjecting the project to a second SEQRA review. The Supreme Court noted that under SEQRA, the lead agency has wide latitude in the type and placement of reasonable modifications or mitigation measures. These modification may include "off-site" modifications as reasonable alternatives. Further, the Supreme Court noted that the DEC retained jurisdiction over the primary dune because it would monitor the petitioners' efforts to restore the dunes when necessary.

The Supreme Court then proceeded to reject the Board's argument that the DEC failed to conduct a proper coordinated review of the application. Initially, the court noted that the Board and the Town of Southampton had agreed that the DEC, the third involved agency, would be the lead agency. In acting as lead agency, the DEC expressed concerns that the project may have a significant environmental impact, and offered a range of modifications. All of the interested and involved agencies were made aware of the recommended modifications by the DEC, and none of them voiced any concern at that point. The court stated that the Board did not challenge the DEC's issuance of the tidal wetlands permit.

The court concluded that the Board had no authority to commence its own SEQRA review, stating in pertinent part, "[E]ven if the CEHA Board subsequently obtained variance jurisdiction over the petitioner's projects as the result of the petitioners' projects being moved to the landward toe of the primary dune, commencement of a *de novo* SEQRA review is not warranted." The Supreme Court, however, did agree that the Board's determination that variances would be required for the projects as modified was supported by the record.

The court denied the Board's motion to dismiss based upon the grounds of ripeness, mootness, and res judicata. The court granted the petition to the extent that,

> "the portion of the January 19, 1995 resolutions of the CEHA Board, wherein the CEHA Board assumed lead agency status, initiated its own SEQRA review of Petitioners' projects, determined the Petitioners' projects to be Unlisted Actions and might have a significant environmental effect, issued a positive declaration and directed that a scoping session shall be held, is annulled."

The court proceeded to enjoin the Board

> "from commencing and continuing with independent SEQRA review in connection with any applications concerning the projects for which Petitioners received tidal wetlands permits from [DEC] on September 13, 1993 and from taking any actions pursuant to SEQRA which are contrary to the negative declarations issued by the [DEC] on August 13, 1993."

The Board appeals from so much of the judgment as denied its motion to dismiss the petition, and granted the petition to the extent of (1) annulling portions of the January 19, 1995, determination of the Board in which, inter alia, it initiated its own SEQRA review and issued its own positive declaration and (2) enjoining the Board from commencing or continuing its own independent SEQRA review.

*Discussion:*

The judgment of the Supreme Court should be affirmed insofar as appealed from. Under the circumstances of this case, the appellants are bound by the DEC's negative declaration, and may not perform their independent subsequent SEQRA review.

Pursuant to 6 NYCRR 617.1 (c), "[t]he basic purpose of SEQRA is to incorporate the consideration of environmental factors into the existing planning, review and decisionmaking processes of state, regional and local government agencies at the earliest possible time." To that end, 6 NYCRR 617.1 (c) also states that SEQRA requires that these agencies determine whether the proposed projects may have a significant impact on the environment.

In the present case, both the Board and the DEC have an interest in the proposed bulkheads. As such, the appellants

are, at the very least, an interested agency in that they may lack jurisdiction to fund or approve the action, but may wish to participate in the review process because of concerns about the proposed action (*see* 6 NYCRR 617.2 [t]). Further, under 6 NYCRR 617.2 (t), an "interested agency has the same ability to participate in the review process as a member of the public" (internal quotation marks omitted).

Here, it was the Administrator who initiated contact with the DEC upon receipt of the petitioner's application and advised the DEC that he did not want to act as lead agency for the coordinated SEQRA review, and specifically requested that DEC assume that role. DEC replied that it would do so and classified the action as an unlisted action. The Board did not oppose this action or even express any concerns. The DEC made a timely pronouncement that the petitioners would receive a positive declaration requiring a draft EIS, unless they were willing to consider alternatives. The Board was made aware of this action as well. The Board, as an interested agency, should have made any of its concerns known at that juncture (*see* 6 NYCRR 617.3 [e]). The Board failed to do so, and did not voice objections until after the alternative proposal was accepted by the DEC and the DEC issued the negative declaration pursuant to its authority and duty as lead agency. The designation of the Board as an interested agency rather than an involved agency is of no import to this issue (*see Matter of Scenic Hudson v Town of Fishkill Town Bd.,* 266 AD2d 462; *Matter of King v County of Monroe,* 255 AD2d 1003).

The statutory law is quite clear that once the declaration has been issued, it is binding on all concerned. Specifically, 6 NYCRR 617.6 (b) (3) (iii) states,

> "[I]f a lead agency exercises due diligence in identifying all other involved agencies and provides written notice of its determination of significance to the identified involved agencies, then no involved agency may later require the preparation of an EAF, a negative declaration or an EIS in connection with the action. The determination of significance issued by the lead agency following coordinated review is binding on all other involved agencies."

This Court has previously spoken on this issue in *Matter of Friedenburg v Korman* (232 AD2d 414), and held that when an interested agency is kept thoroughly informed of the SEQRA process and remains essentially silent during the course of the

process, the lead agency's declaration is binding and the "aggrieved" agency cannot force the SEQRA process to begin anew (*see Residents of Bergen Believe in Envt. & Democracy v County of Monroe,* 159 AD2d 81).

"[I]t is also well established that, in reviewing the substantive issues raised in a SEQRA proceeding, an appellate court will not substitute its judgment for that of the agency if the agency reached its determination in some reasonable fashion" (*Mobil Oil Corp. v City of Syracuse Indus. Dev. Agency,* 224 AD2d 15, 22, citing *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 416-417). In that regard, as long as the evidence demonstrates that the lead agency took a "hard look" at the possible environmental effects of the proposed project, that is sufficient for the purposes of appellate review (*see Matter of Jackson v New York State Urban Dev. Corp., supra*). In the present case, the DEC clearly reviewed all the relevant evidence concerning the bulkheads and advised the petitioners that a draft EIS would be required if they did not follow the DEC's advice concerning alternatives. The DEC even conditioned approval on the terms that the petitioners would have to repair the beach and sand dunes when required, or if that proved inadequate, they would have to remove the bulkheads. As such, the conclusion of the DEC was not arbitrary, capricious, or an abuse of discretion and should not be disturbed (*see Matter of City of Rye v Korff,* 249 AD2d 470). Further, to the extent that the Board had a viable claim, the proper course of action would have been to initiate a timely CPLR article 78 action pertaining to the DEC's negative declaration, which the Board failed to do (*see* ECL 25-0404; CPLR 217).

Lastly, the Board's claims of the lack of ripeness and res judicata are unpersuasive. The issuance of a positive declaration created a justiciable controversy which formed the basis of this proceeding (*see Matter of Huntington Yacht Club v Incorporated Vil. of Huntington Bay,* 272 AD2d 327; *see also Matter of Essex County v Zagata,* 91 NY2d 447). Regarding res judicata, the Board is precluded from raising this as an issue at this juncture because it had assumed a contrary position in the earlier *Matthews* actions (*see Prudential Home Mtge. Co. v Neildan Constr. Corp.,* 209 AD2d 394).

Accordingly, the judgment is affirmed insofar as appealed from.

Friedmann, Adams and Townes, JJ., concur.

Ordered that the judgment is affirmed insofar as appealed from, without costs or disbursements.