WESTCHESTER DAY SCHOOL,
Plaintiff,

v.

VILLAGE OF MAMARONECK, the Board of Appeals of the Village of Mamaroneck, Antonio Vozza, James Gaita, George Mgrditchian, Barry Weprin and Clark Neuringer, in Their Official Capacity as Members of the Board of Appeals of the Village of Mamaroneck, Defendants.

No. 02 CIV. 6291(WCC).

United States District Court,
S.D. New York.

Dec. 4, 2002.

Morrison & Foerster, L.L.P., New York City (Jack C. Auspitz, Esq., Joel C. Haims, Esq., Of Counsel) Bernstein, Liebhard & Lifshitz, L.L.P., New York City (Stanley D. Bernstein, Esq., Of Counsel), for Plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY (Steven M. Silverberg, Esq., Katherine Zalantis, Esq., Of Counsel), for Defendants.

Carter, Ledyard & Milburn, New York City (Stephen L. Kass, Esq., Mark D. Sullivan, Esq., Samantha Klein, Esq., Of Counsel), for Amicus Curiae Sound.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Westchester Day School ("WDS"), brings this action against defendants Village of Mamaroneck, the Zoning Board of Appeals of the Village of Mamaroneck ("ZBA"), and Antonio Vozza, James Gaita, George Mgrditchian, Barry Weprin and Clark Neuringer, in their official capacity as members of the ZBA. Plaintiff seeks relief under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), as well as under 42 U.S.C. § 1983 alleging unlawful and unconstitutional burdens being imposed by defendants to obstruct the school's right to construct a new school building.

Defendants have moved to dismiss plaintiff's complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiff has cross moved for partial summary judgment under FED. R. CIV. P. 56 on the issue of whether the actions taken by defendants at a meeting of the ZBA on August 1, 2002 are void and unenforceable. For the reasons discussed below, plaintiff's motion for partial summary judgment is granted, thereby rendering moot defendants' motion to dismiss.

## BACKGROUND

Since 1948, WDS has held a special permit to operate an Orthodox Jewish day school on a 25.75–acre property in the Orienta Point neighborhood of the Village of Mamaroneck (the "Property"). (Hammerman Aff. ¶ 5.) In October 2001, WDS submitted an application for a modification of its special permit to allow it to construct a new classroom structure to connect two of the existing school buildings and to renovate two of the school buildings (the "Pro-

ject"). (*Id.* ¶ 9.) Public hearings on the application were held by the ZBA between November 1, 2001 and February 7, 2002. During this time, the ZBA requested and received comments from professional planning and traffic engineering consultants as well as from various agencies. (Pl. Rule 56.1 Stmt. ¶ 68.) On December 6, 2001, the ZBA voted unanimously to designate itself as the "lead agency" on the Project for purposes of the State Environmental Quality Review Act ("SEQRA"). (Hammerman Aff. ¶ 6.) On February 7, 2002, the five member Board of Appeals voted unanimously to issue the school a "negative declaration"—a determination by the ZBA that no significant adverse environmental impacts will result and that no Environmental Impact Statement ("EIS") process is required. (*Id.* ¶ 17.)

Shortly thereafter, an outcry of community opposition arose and on April 4, 2002, the ZBA voted unanimously to hold a rehearing to review its "negative declaration" determination. During the rehearing period, additional public hearings were held. Plaintiff maintains that these hearings uncovered no new information relating to any significant adverse environmental impacts of the Project. (Complt.¶ 5.) Defendants argue that new information was brought to the ZBA's attention that significantly affected its decision with respect to both the environmental impact of the Project and its effects on the public safety, specifically concerning congestion of an emergency evacuation route. (Defs. Mem. Supp. Mot. Dismiss at 23.) On August 1, 2002, the ZBA voted separately under both New York State Village Law and SEQRA to rescind the "negative declaration" and to issue a positive declaration, which would require WDS to prepare a full EIS prior to issuance of the special permit. (Pl. Rule 56.1 Stmt. ¶ 68.) Under SEQRA 6 NYCRR § 617.7(f), the ZBA voted three to two in favor of rescinding

the "negative declaration." Under New York Village Law ("Village Law") § 7–712–a(12), the ZBA voted three to two against rescission. Pursuant to the SEQRA vote, the ZBA has taken the position that it has effectively rescinded the "negative declaration" and has required plaintiff to begin the EIS process.

The parties disagree as to whether Village Law or SEQRA governs the rescission of the "negative declaration." Plaintiff claims that the rescission by the ZBA of its "negative declaration" is void and unenforceable because the rehearing was held under the provisions of Village Law § 7–712–a(12) which requires a unanimous vote of all present members to effectively rescind a "negative declaration." Plaintiff further argues that even if the ZBA was acting under SEQRA, the vote was nevertheless unenforceable as there was no new information discovered nor were there any changes in circumstances not previously considered by the ZBA when it voted to issue the "negative declaration," as required under § 617.7(f).

Defendants claim that SEQRA governs the rescission of the "negative declaration" and therefore, a unanimous vote of the ZBA was not necessary in rescinding the "negative declaration" and issuing a positive declaration. (Defs. Mem. Supp. Mot. Dismiss at 17.) Additionally, defendants argue that they acted in accordance with SEQRA provision 617.7(f) because new information was brought to the ZBA's attention that significantly impacted its decision to issue the "negative declaration." (*Id.* at 23.)

As the Court's decision on plaintiff's summary judgment motion may be dispositive with respect to defendants' motion to dismiss, the Court will first address plaintiff's motion.[1]

## DISCUSSION

### I. *Summary Judgment Standard*

Plaintiff moves for partial summary judgment pursuant to FED. R. CIV. P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–

---

1. If the Court were to grant plaintiff's summary judgment motion and find as a matter of law that the "negative declaration" was unlawfully rescinded by the ZBA at its August 1, 2002 meeting, we would, in effect be holding that the ZBA's rescission is unenforceable. Consequently, the "negative declaration" is-sued by the ZBA on February 7, 2002 would remain in effect thereby eliminating the need for WDS to pursue the EIS process under SEQRA and permitting plaintiff to move forward with the special permit phase of the Project.

23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022 (2d Cir.1991).

## II. *Village Law v. SEQRA*

Plaintiff claims that Village Law § 7–712–a(12) governs the rescission of the "negative declaration" and therefore the ZBA's three-to-two vote in favor of rescission at the August 1, 2002 meeting failed to satisfy the provision's unanimous vote requirement, rendering void the ZBA's subsequent issuance of a positive declaration. (Pl. Mem. Supp. Summ. J. at 1–2.) Defendants argue that SEQRA § 617.7(f) governs. According to defendants, because this section does not mention a voting requirement, a majority vote was sufficient and thus the ZBA's three-to-two vote effectively rescinded their "negative declaration." (Defs. Mem. Opp. Summ. J. at 9–10.)

█ The record reveals that separate votes were held under both Village Law and SEQRA at the August 1, 2002 meeting. (Neuringer Aff. ¶ 19; Complt. ¶ 5.) Neither the parties nor our own research has uncovered any caselaw that addresses the issue of whether Village Law or SEQRA governs a board of appeal's rescission of a "negative declaration." [2] Consequently, in determining which law governs the ZBA's rescission we look to the rules of statutory construction. [3] In determining which law governs it is a well settled principle of statutory construction that "specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." *State v. State Employees' Review Board*, 239 Conn. 638, 687 A.2d 134, 143 (1997); *see also Varity Corp. v. Howe*, 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (applying a standard canon of statutory construction, that in the event of a conflict, the more specific provision will control the general). We turn now to the relevant language of the statutes. Village Law § 7–712–a(12) provides that "[u]pon such rehearing the board may reverse, modify or annul its original order, decision or determination upon the unanimous vote of all members then present...." SEQRA provision § 617.7(f), titled "rescission of negative declarations" states under subsection (1):

At any time prior to its decision to undertake, fund or approve an action, a

---

**2.** We do note the case, *Matter of United Water New Rochelle, Inc. v. Zoning Board of Appeals of Town of Eastchester*, 254 A.D.2d 490, 679 N.Y.S.2d 627 (2d Dep't 1998) where the petitioner's "negative declaration" was rescinded pursuant to § 617.7(f). However, a vote under Village Law was never taken, thus the issue of whether § 7–712–a(12) or 617.7(f) governed the planning board's rescission was never before the court.

**3.** We reject defendants' argument that WDS is barred from challenging the ZBA's decision to rescind and issue a positive declaration as this determination is not a final decision and thus is not ripe for review. Defendants draw our attention to *Sour Mountain Realty, Inc. v. New York State Dep't of Environmental Conservation*, 260 A.D.2d 920, 688 N.Y.S.2d 842, 845 (3d Dep't 1999) for the proposition that New York courts characterize a positive SEQRA declaration as an interim determination, which is not ripe for judicial review until the agency has made a final decision. While this is an accurate statement of the law, defendants reliance with respect to the issue before this Court on plaintiff's motion for summary judgment is misplaced.

In *Sour Mountain Realty*, the petitioner challenged the issuance by respondent State Department of Environmental Conservation ("DEC") of a positive declaration requiring that petitioner prepare a supplemental environmental impact statement to address the discovery—subsequent to DEC's acceptance of petitioner's draft environmental impact statement—of timber rattlesnakes. The instant case, however, presents a different issue, that is whether the ZBA properly rescinded its "negative declaration" under SEQRA or whether it could only act through a unanimous vote pursuant to Village Law.

lead agency must rescind a "negative declaration" when substantive: (i) changes are proposed for the project; or (ii) new information is discovered; or (iii) changes in circumstances related to the project arise; that were not previously considered and the lead agency determines that a significant adverse environmental impact may result.

Although the ZBA's act of rescission could theoretically fit within the ambit of § 7–712–a(12), the Village Law is a general statute which applies to any "original order" of the board. Section 617.7(f) on the other hand is a more specific statute which applies to the rescission of negative declarations. Thus, to the extent the two statutes' voting requirements are in conflict, § 617.7(f), as the statute addressing the matter at issue in specific terms, controls unless there is a clear legislative intention to the contrary. *Tyler v. Douglas*, 280 F.3d 116, 124 (2d Cir.2001). We find no such contrary legislative intent. It appears that § 7–712–a(12) was enacted, at least in part, to define the powers of a zoning board of appeals to grant variances.[4] We have uncovered no specific reference to the power of a board to rescind a "negative declaration" in the statute's legislative history or elsewhere. As a result, the law of statutory construction directs us to consider the ZBA's rescission

of its "negative declaration" under SEQRA § 617.7(f).[5]

### III. SEQRA § 617.7(f)

 Having established that § 617.7(f) governs the ZBA's actions in rescinding a "negative declaration," we turn now to the issue of whether the ZBA acted in accordance with this SEQRA provision. As an initial matter, however, we must revisit defendants' ripeness argument. According to defendants, the ZBA's decision under SEQRA to rescind the "negative declaration" is not subject to review. (Defs. Mem. Supp. Mot. Dismiss at 5.) Although defendants' ripeness argument does accurately characterize the ZBA's positive declaration as an interim determination not typically ripe for judicial review,[6] the Second Circuit appears to have recognized a futility exception to the final decision requirement in land use cases. *See Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 98–99 & n. 8 (2d Cir. 1992) (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)); *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 350 n. 7, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986). Under this exception, certain procedures that a plaintiff normally would be required to pursue in order to receive a final determination may be excused if the plaintiff can demon-

---

4. For example, the Commission on Rural Resources, in writing in support of the bill to introduce Village Law § 7–712–a(12) stated that "the bill determines the power of a zoning board of appeals to grant variances" and will "enable[] property owner[] to understand the law concerning variances." (Defs.Mem.Opp.Summ. J., Ex. 2.) Additionally, the State of New York, Department of State, stated in support of the bill that "[t]his bill would make a complex statute more understandable to boards of appeals and would clarify the circumstances under which variances may be granted."

5. Save Our Unique Neighborhood ("SOUND"), as *amicus curiae* has submitted a memorandum of law in opposition to the motion for partial summary judgment of WDS and in support of the motion to dismiss of the ZBA addressing the issue of whether SEQRA or Village Law should apply to the ZBA's rescission. In considering SOUND's arguments that SEQRA should govern the ZBA's actions, we feel that our decision to apply § 617.7(f) is sufficiently grounded in the law of statutory construction.

6. *See infra* text accompanying note 3.

strate, by more than mere allegations, that they would be futile. *See Honess 52 Corp. v. Town of Fishkill,* 1 F.Supp.2d 294, 300 (S.D.N.Y.1998) (Conner, J.) (citing *Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 920 F.2d 1496, 1501 (9th Cir. 1990)). Under the futility exception, this Court is persuaded that plaintiff's Complaint sufficiently demonstrates a justiciable controversy. The crux of the Complaint is that plaintiff is entitled to the approval of an application to allow it to construct and renovate school buildings on the property and that defendants' actions demonstrate that no such approval will be forthcoming before an EIS is submitted, a lengthy process that will significantly delay the Project and dramatically increase its cost to plaintiff. (Complt. ¶ 3; Pl. Mem. Supp. Summ. J. at 7.) According to plaintiff, despite the WDS's submission of "comprehensive analyses and extensive studies of all relevant potential environmental impacts of the project, including impacts on traffic, drainage, storm water management, utilities, aesthetics and lighting," the ZBA rescinded their "negative declaration" based on issues that "have already been thoroughly studied and found appropriate by professionals reviewing the project." (Complt.¶¶ 4–7.) In light of the allegations of delay and futility, plaintiff has sufficiently shown that the ZBA's rescission and subsequent issuance of a positive declaration is fit for review.[7] *See AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship,* 6 F.3d 867, 872 (2d Cir.1993).

 We have uncovered no caselaw, and the parties have cited none, that interprets § 617.7(f). As a result, the Court is guided by the plain language of this provision as well as other sections within SEQRA. *See Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ("a section of a statute should not be read in isolation from the context of the whole Act..." "...we must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy."). As a general proposition, judicial review of an agency's SEQRA determination is limited to whether the agency identified the relevant areas of environmental concern, took the requisite "hard look" at such areas and, finally, made a "reasoned elaboration" as to the basis for its determination. *See Matter of Hoffman v. Town Bd. of Town of Queensbury,* 255 A.D.2d 752, 680 N.Y.S.2d 735 (1998) (codified as § 617.7(b)). With this applicable law in mind, we turn now to the concerns defendants raise in support of their argument that the ZBA's decision to rescind their "negative declaration" was rational and supported by substantial evidence in accordance with SEQRA.

Defendants cite four principal concerns. First, great emphasis is placed on the testimony of Michael Horodniceanu, a traffic engineer who claimed that the ZBA's "negative declaration" was deficient in that it: (1) did not consider Orienta Avenue as an emergency evacuation route; (2) was based on a faulty premise that traffic would increase at a rate of only 2% when in actuality, the rate of increase was up to 5%; (3) was not clear whether seasonal adjustments were made to the traffic counts as they were done on a single day in June; and (4) two intersections affected by plaintiff's application were not studied at all. (Defs. Mem. Supp. Mot. Dismiss at

---

7. Also weighing in favor of our determination that the ZBA's positive declaration is properly before this Court is the fact that extensive hearings have been held concerning environmental issues ranging from traffic impact to aesthetics, creating a sufficient record rendering this issue ripe for review. *See In re Gordon,* 299 A.D.2d 20, 745 N.Y.S.2d 183, 188 (2002).

23.) Second, defendants claim that issues remain with respect to the enrollment of the high school and its impact on traffic. Third, defendants maintain that a more detailed analysis is necessary to address and mitigate any visual impact the Project may impose. Finally, defendants contend that further study is required due to the property's location in an environmentally sensitive area. (*Id.* at 23–24.)

It is clear, based on the record before us that traffic was the primary concern regarding the Project's impact on the surrounding environment as well as the subject of several hearings before the ZBA. The Court notes that traffic issues concerning the Orienta Avenue area were considered extensively before issuance of the "negative declaration." (Pl.Mem.Supp. Summ. J., Ex. 5.) For example, Frank Fish, the Village's Planning Consultant, stated at the January 3, 2002 hearing that his traffic engineer felt the analysis done by WDS showed that the level of service at Orienta Avenue coming onto Boston Post Road was the greatest concern, but that it was already a sensitive area that would likely go from a Level D to a Level E capacity with or without the Project. (Pl. Mem.Supp.Summ. J., Ex. 4.) Mr. Fish further commented that he didn't see this as a significant adverse impact and pointed out that the operation of the school did not always overlap with the afternoon peak hours of traffic in this area.[8] (*Id.*) Although Orienta Avenue as an emergency evacuation route was not specifically addressed, concerns were raised at a December 6, 2001 hearing regarding the costs of fire protection, police and water to the area. (*Id.,* Ex. 3.) Additionally, J. Michael Divney, an engineer and site planner for

the Project noted that a gate on Skibo Lane would be erected for emergency purposes only. (*Id.,* Ex. 4.) Finally, we note Clark Neuringer's, a member of the ZBA, invitation for other entities in the Orienta area to share with the board their concerns on how the Project might impact Orienta. (*Id.*)

We fail to see how the ZBA could have rescinded its "negative declaration" pursuant to § 617.7(f) based on its concern for traffic impact on the Orienta area. Even if Orienta Avenue is an emergency evacuation route, this alone would not warrant rescission as it constitutes neither a "substantive change" in the Project or "new information" under § 617.7(f). Furthermore, it is clear that the issue of traffic impact was considered at length before the ZBA issued its "negative declaration." Indeed the record demonstrates that at several hearings prior to the ZBA's issuance of its "negative declaration," much discussion centered on the Orienta area traffic impact in the form of professional opinions as well as citizen comments. The ZBA therefore took the requisite "hard look" at this issue prior to issuing the "negative declaration." *See Matter of Manes v. Simpson,* 108 A.D.2d 914, 485 N.Y.S.2d 802 (1985).

The Court reaches a similar conclusion with respect to defendants' position that the ZBA's review leading to its "negative declaration" was based on a deficient traffic analysis. In response to a citizen's concern at the January 3, 2002 hearing regarding plaintiff's traffic projections, Mr. Divney explained that they had measured the traffic by having actual individuals at the intersections and at the gates counting

---

**8.** In response to a traffic study indicating that about 450 cars per hour came down Orienta Avenue and 250 on Rushmore Avenue, a local citizen stated at a December 6, 2001 hearing that the additional 150 people between stu-

dents and staff would add another 40 to 50 cars on Orienta. (Pl.Mem.Supp.Summ. J., Ex. 3.) This traffic projection on Orienta Avenue is a bit overreaching however, in light of Mr. Fish's comments.

357

vehicles. (Pl.Mem.Supp.Summ. J., Ex. 4.) He stated that they used the existing school population and they determined the peak hours. He further stated that the school's arrival and departure times were staggered and that some of the staff and teachers came at different times. (*Id.*) He also noted that 76% of their current students came by bus. Mr. Divney then explained that they computed a ratio of traffic to students and applied that same ratio to the additional students. He further commented that the pattern of arrival and departure by students, parents and staff would not be much different in terms of peak-hour volume. (*Id.*) Mr. Fish noted at the same hearing that he had gone through the traffic numbers contained in Mr. Divney's 100–page report and had no disagreements.[9] Moreover, Antonio Vozza, chairman of the ZBA stated at the February 7, 2002 hearing that any further study on the impact from traffic would not give the ZBA anything additional upon which to base its decision. (*Id.*, Ex. 5.)

Based on the record before us, we cannot conclude that the ZBA properly rescinded its "negative declaration" pursuant to SEQRA. Although defendants claim that two intersections with Boston Post Road affected by plaintiff's application were not studied at all, this should not necessarily render the traffic analysis deficient and warrant rescission under § 617.7(f)(iii) in light of Mr. Fish's discussion at the January 3, 2002 hearing. As stated above, there Mr. Fish commented that his traffic engineer felt that the analysis they did showed that the levels of

service at Orienta Avenue coming onto Boston Post Road was the matter of greatest concern, but that it was already a sensitive intersection that would likely go to a Level E capacity with or without this Project. (*Id.*, Ex. 4.) Additionally, Mr. Divney's report appears to have addressed the issue of intersection traffic extensively.[10] Defendants insist that the traffic study was based on a faulty premise that traffic would increase at a rate of only 2%. Even if defendants turn out to have been correct that the rate of traffic increase is up to 5%, it would not follow that the ZBA was justified in its rescission pursuant to SEQRA. *See Ludlow Park Homeowners Ass'n v. County of Westchester,* 741 F.Supp. 1126, 1131 (S.D.N.Y.1990).

That the ZBA took a "hard look" at potential adverse effects resulting from any traffic impact is evidenced by the fact that the ZBA requested Mr. Fish to examine the traffic materials submitted by plaintiff and to submit comments for the next meeting. (Pl.Mem.Supp.Summ. J., Ex. 4.) At the subsequent January 3, 2002 meeting, Mr. Fish explained at length his review of Mr. Divney's traffic analysis and report. Specifically, Mr. Fish commented that none of the issues raised would require an EIS and noted that he had gone through Mr. Divney's traffic numbers and had no disagreements. (*Id.*) Based on the above, the ZBA was not justified in rescinding its "negative declaration" under SEQRA premised on any traffic-related impact of the Project.

---

**9.** Mr. Fish subsequently pointed out that the traffic generation numbers would have been higher if the Institute of Transportation Engineers' numbers were used, but stated that Mr. Divney's numbers were not invalid because they were based on actual counts. (*Id.*, Ex. 4.)

**10.** At the January 3, 2002 hearing, Mr. Divney explained that each intersection had been evaluated in terms of how it performed both in the morning and the afternoon with respect to how it was currently, how it would be in the future with a 2 % growth per year, and how it would be in the future with a 2 % growth and the Project implemented. (*Id.*, Ex. 4.)

■ Defendants' contention that rescission was proper based on new issues arising concerning the enrollment of the high school on the same parcel as WDS similarly fails. (Defs. Mem. Supp. Mot. Dismiss at 24.) The record reveals that the issue of student enrollment was addressed early on at the December 6, 2001 meeting where Mr. Neuringer asked what the current total student population of the school was, including the high school, as well as the amount of increase that was projected for the future. (Pl.Mem.Supp.Summ. J., Ex. 3.) Citizen comments and concerns regarding the enrollment issue were also addressed at the December meeting.[11] Thus it is difficult to see how student enrollment represented new information or a substantive change that came to the ZBA's attention subsequent to their issuance of the "negative declaration." Moreover, the ZBA, as well as concerned citizens, apparently prevailed upon WDS to implement a cap on student enrollment.[12] As a result, it cannot be said that the ZBA failed to take a "hard look" at this issue. *See Lucas v. Planning Bd. of Town of LaGrange*, 7 F.Supp.2d 310, 323 (S.D.N.Y.1998) (finding that the Town had taken a "hard look" at potential adverse effects of the Project due to their success in prevailing upon defendants to change their original proposals).

■ Defendants' concerns regarding visual impacts of the Project were also aired extensively prior to the ZBA's "negative declaration." At the January 3, 2002 meeting Mr. Fish noted that there were only four homes that would be directly affected by the mass of the new building and thus a landscaping and screening plan for the adjacent properties were not environmental issues that the ZBA needed to address. (Pl.Mem.Supp.Summ. J., Ex. 4.) Mr. Fish also addressed WDS's failure at that time to submit a lighting plan but commented that lighting might only be an issue for four or five homes. A final visual impact issue Mr. Fish discussed was a long corridor in plaintiff's proposed plan that would connect the two buildings on the property. Mr. Fish was of the opinion that the corridor blocked views from Long Island Sound and he felt there was no reason to have that connection. (*Id.*) Mr. Fish concluded his comments on this topic by stating that none of the issues raised would require an EIS. The ZBA again succeeded in prevailing upon WDS to accommodate many of the issues raised by Mr. Fish at the January 3, 2002 meeting.[13]

---

11. Rosanne Aresty, a Mamaroneck resident and Director of the Orienta Point Association noted that "the main concern from the neighborhood's point of view was traffic and they had come up with a compromise position that, as a condition of the special permit, there be a cap on enrollment." (*Id.*, Ex. 5.)

12. James Staudt, Esq., who appeared at the February 7, 2002 meeting on behalf of WDS stated that the applicant would have no objection to having a cap if it would resolve the issue. (Pl.Mem.Supp.Summ. J., Ex. 5.) Additionally, Steven Silverberg, the Village attorney, noted at the December 6, 2001 meeting that the ZBA could require as a condition to granting a "negative declaration" some maximum on student enrollment. (*Id.*, Ex. 3.)

13. For example, in response to Mr. Fish's comment that a fence owned by WDS "was not aesthetically nice," Mr. Staudt stated that although it was for security, the fence could be made more attractive. Additionally, Mr. Divney stated that the comments made at the January 3, 2002 meeting were very helpful and, in most cases, could be accommodated. (Pl.Mem.Supp.Summ. J., Ex. 4.) At the subsequent February 7, 2002 meeting, Mr. Fish pointed out that "the applicant had offered to create a landscaped lawn area to improve that one block of Walton Avenue, which he felt would certainly enhance the area if done properly." (*Id.*, Ex. 5.)

■ Finally, we address defendants' position that the ZBA was justified in rescinding its "negative declaration" based on the property's location in an environmentally sensitive area. In support of their argument, defendants draw our attention to the fact that the property is included within the Village's coastal zone. (Defs. Mem. Supp. Mot. Dismiss at 24.) The Court agrees that any proposed development in such an area would certainly require greater consideration as to environmental implications. The record demonstrates however that plaintiff has adequately addressed the Project's impact in this particularly sensitive locale. Of special significance is plaintiff's appearance before the Coastal Zone Management Commission and their subsequent issuance of a consistency resolution on January 16, 2002. (Pl.Mem.Supp.Summ. J., Ex. 5.) Moreover, WDS's several modifications to their original proposal to address the sensitive nature of the Project's location provides this Court with ample evidence that the ZBA took a sufficient "hard look" at this concern before issuing the "negative declaration." For example, plaintiff modified its original proposal to include new impervious surfaces to mitigate drainage problems on existing tidelands and the Long Island Sound. *See Committee to Preserve Brighton Beach and Manhattan Beach, Inc. v. Planning Comm'n of City of New York*, 259 A.D.2d 26, 695 N.Y.S.2d 7, 14 (1999) (finding no SEQRA violation where contaminants were identified and studied, and mitigating plans adopted to prevent the migration of contaminants during the operation or construction of the facility). Additionally, plaintiff's application provides for the stormwater from the parking areas to be directed into stormwater quality basins and pretreated through sand filters before entering the Sound. (Pl.Mem.Supp.Summ. J., Ex. 5.) The stormwater from the roof of the building will be collected and also discharged following sand filtration and infiltration. Lastly, the stormwater drainage pipe will be installed outside of all wetlands. (*Id.*) It is apparent therefore, that the ZBA did in fact consider the issue of the property's location in an environmentally sensitive area before the "negative declaration" was issued.

## CONCLUSION

This Court is reluctant to upset the determinations of a specialist administrative board, but in this case that board, after extensive hearing and consideration, concluded that plaintiff's proposed improvements to its educational facility, would not have sufficient negative impact on the environment to warrant the delay and expense of an EIS. That conclusion was rescinded, not because of any change in the Project or any new evidence, but in response to belated public outcry. Such rescission did not satisfy the requirements of the applicable statute.

The ZBA was required to act pursuant to SEQRA in rescinding the "negative declaration." However, the record reveals that none of the concerns defendants raise in support of their argument that the ZBA's decision to rescind was rational and supported by substantial evidence rise to the level of a "substantive change" in the Project or "new information" as required under § 617.7(f). Defendants' argument also fails to justify the ZBA's rescission under general principles governing SEQRA review as the record before us indicates that the ZBA identified and took the requisite "hard look" at defendants' concerns and made a "reasoned elaboration" as to the basis for its "negative declaration." We therefore grant plaintiff's motion for partial summary judgment and hold that the "negative declaration" was not properly rescinded and is still in full

**360**

force and effect. In light of this holding, we need not address the merits of defendants' motion to dismiss plaintiff's Complaint.

SO ORDERED.