**WESTCHESTER DAY SCHOOL,**
Plaintiff,

v.

**VILLAGE OF MAMARONECK, the Board of Appeals of the Village of Mamaroneck, Mauro Gabriele, George Mgrditchian, Peter Jackson, Barry Weprin and Clark Neuringer, in Their Official Capacity as Members of the Board of Appeals of the Village of Mamaroneck, and Antonio Vozza, in His Official Capacity as a Former Members of the Board of Appeals of the Village of Mamaroneck, Defendants.**

No. 02 CIV.6291 WCC.

United States District Court,
S.D. New York.

Sept. 5, 2003.

As Amended Nunc Pro Tunc Oct. 1, 2003.

■■■■■■■■

■■■■■■■■
■■■■■■■■
■■■■■■■■

———

Morrison & Foerster, L.L.P. (Jack C. Auspitz, Esq., Joel C. Haims, Esq., Of Counsel), Bernstein, Liebhard & Lifshitz, L.L.P. (Stanley D. Bernstein, Esq., Of Counsel), New York City, for Plaintiff.

Thacher Proffitt & Wood, (Kevin J. Plunkett, Esq., Lino J. Sciarretta, Esq., Darius P. Chafizadeh, Esq., Of Counsel), White Plains, NY, Law Offices of Joseph C. Messina (Joseph C. Messina, Esq., Lisa M. Fantino, Esq., Of Counsel), Mamaroneck, NY, for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Westchester Day School ("WDS" or "plaintiff"), brings this action against defendants Village of Mamaroneck, the Zoning Board of Appeals of the Village of Mamaroneck ("ZBA"), Mauro Gabriele, Peter Jackson, James Gaita, George Mgrditchian, Barry Weprin and Clark Neuringer, in their official capacity as members of the ZBA.[1] Plaintiff has moved for partial summary judgment under FED. R. CIV. P. 56 on Counts I and II of their Amended Complaint. Count I alleges that by not allowing WDS to undertake the construction and renovations outlined in their special permit application ("Application"), defendants have imposed a substantial burden on the free exercise of religion by WDS, without any compelling govern-

ment interest to do so, in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"). Count II of the Amended Complaint alleges that the decision to deny the Application was arbitrary and capricious and was not supported by evidence in the record and seeks relief under the All Writs Act, 28 U.S.C. § 1651. For the reasons discussed below, plaintiff's motion for partial summary judgment is granted.

## BACKGROUND

The facts concerning this action are set forth in the Court's Opinion and Order of December 4, 2002 (the "Order"), *Westchester Day School v. Village of Mamaroneck,* 236 F.Supp.2d 349 (S.D.N.Y.2002), and familiarity with that decision is presumed. The facts pertinent to the instant motion are as follows. The Court's prior Order held that the negative declaration (a determination by the ZBA that no significant adverse environmental impacts will result and that no Environmental Impact Statement process is required) was not properly rescinded and is still in full force and effect. Additional public hearings on the Application were then held in December 2002 and January, February and March 2003. On January 10, 2003, a conference was held before this Court, during which the Court directed the ZBA to give WDS a list of outstanding issues that were of concern to the ZBA and that might impede the issuance of the special permit modification to WDS. The ZBA provided WDS with its issues list on January 17, 2003 and WDS responded to each issue on January 30, 2003. (Hammerman Aff., Ex. B; Hammerman Aff. ¶ 17.)

---

1. This action is also being brought against Antonio Vozza in his official capacity as a former member of the ZBA.

At the public hearing on February 6, 2003, the ZBA indicated that they wanted to hold a special meeting to "wrap up" the Application and that it wanted to address only two remaining issues at that special meeting—one, the possibility of moving the new building (Gordon Hall) slightly further from the property line and, two, the overall square footage of Gordon Hall. (Pl. Mem. Supp. Summ. J. at 7.) The ZBA also asked to see a rear visual of Gordon Hall from Skibo Lane. At the hearing on March 13, 2003, after a few hours of discussion and public comment, the ZBA closed the public hearing and began its deliberations. (*Id.* at 8.) Just prior to the close of the public hearing, WDS asked the ZBA if there was anything else the ZBA wanted WDS to address, and the ZBA responded no. (Hammerman Aff. ¶ 19.)

The ZBA continued to deliberate over the next two months, including publicly on April 3, 2003, May 1, 2003 and May 13, 2003. On May 13, 2003, the ZBA voted 3–2 to adopt a resolution denying the Application in its entirety (the "Resolution"). (Hammerman Aff., Ex. E.)

## DISCUSSION

### I. *Summary Judgment Standard*

Plaintiff moves for partial summary judgment pursuant to FED. R. CIV. P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A

genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

### II. *Constitutionality of RLUIPA*

 Initially, we are mindful of the general proscription that federal courts should not become zoning boards of appeal to review land use determinations. *See Zahra v. Town of Southold,* 48 F.3d 674, 679–80 (2d Cir.1995) (quoting *Sullivan v. Town of Salem,* 805 F.2d 81, 82 (2d Cir.1986)). However, "federal courts may exercise jurisdiction in zoning matters when local zoning decisions, such as here, infringe national interests protected by statute or by the constitution." *Innovative Health Sys., Inc. v. City of White Plains,* 931 F.Supp. 222, 234 (S.D.N.Y.1996). Defendants argue that plaintiff's motion for partial summary judgement should be denied on the grounds that RLUIPA is unconstitutional. We disagree.

### A. *Background of RLUIPA*

On September 22, 2000, President Clinton signed RLUIPA into law. There is little dispute that it was adopted in response to the Supreme Court's partial invalidation in 1997 of the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. §§ 2000bb–

2000bb–4, in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *Freedom Baptist Church of Delaware County v. Township of Middletown,* 204 F.Supp.2d 857, 861 (E.D.Pa.2002). In 1990, the Supreme Court decided *Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that rights under the Free Exercise Clause do not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Id.* at 879, 110 S.Ct. 1595. The Court refused to apply the balancing test employed in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), which held that government actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595. The Court concluded that *Sherbert* has been largely confined to the context in which it was decided—denial of unemployment compensation—and that, in any case, its rule does not apply to neutral laws of general applicability. *Id.* at 879, 110 S.Ct. 1595.

In direct response to *Smith,* Congress in 1993 enacted RFRA. The statute purported to codify the *Sherbert* test and to apply it to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. 42 U.S.C. §§ 2000bb–1, 2000bb(b). Four years later, the Supreme Court struck down RFRA, at least as it relates to state and local governments, in *City of Boerne.* Although Congress may

enforce constitutional rights pursuant to Section 5 of the Fourteenth Amendment, the Court in *City of Boerne* concluded that RFRA exceeded that limited authority by, in effect, defining rights instead of simply enforcing them.

RLUIPA was drawn in an attempt to achieve a constitutional balance. *Elsinore Christian Ctr. v. City of Lake Elsinore,* 270 F.Supp.2d 1163, 1168 (C.D.Cal.2003). The "general rule" of RLUIPA is the same as that provided by RFRA in that state action that "substantially burden[s]" religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." *See* 42 U.S.C. §§ 2000cc(a)(1), 2000cc–1(a). However, RLUIPA's provisions are more narrowly directed than those of RFRA. First, RLUIPA by its terms applies only to governmental action regarding land use or institutionalized persons. *See* 42 U.S.C. §§ 2000cc, 2000cc–1. Second, within those categories, RLUIPA applies only where the substantial burden is imposed: 1) in connection with a federally-funded activity; 2) where the burden affects interstate commerce; or, 3) with respect to land use decisions, where the burden is imposed in the context of a scheme whereby the state makes "individualized assessments" regarding the property involved. *See* 42 U.S.C. §§ 2000cc(a)(2), 2000cc–1(b). We turn now to the specific constitutional attacks defendants advance.

**B. *Section 5 of the Fourteenth Amendment***

◼ Defendants argue that RLUIPA exceeds Congress's power under Section 5 of the Fourteenth Amendment.[2] As noted

---

**2.** A number of courts have addressed the issue of whether RLUIPA is constitutional; most have held that it is with respect to the section of RLUIPA governing the claims of prison inmates. *E.g., Mayweathers v. New-* *land,* 314 F.3d 1062 (9th Cir.2002); *Johnson v. Martin,* 223 F.Supp.2d 820 (W.D.Mich. 2002); *Gerhardt v. Lazaroff,* 221 F.Supp.2d 827 (S.D.Ohio 2002); *Charles v. Verhagen,* 220 F.Supp.2d 955 (W.D.Wis.2002). *But see*

above, *City of Boerne* held that the RFRA exceeded Congress's enforcement powers under Section 5 of the Fourteenth Amendment. In order to determine whether RLUIPA is consistent with *City of Boerne*, it is appropriate to look to Justice Kennedy's consideration of Congress's remedial powers, as they relate to the states, under the Fourteenth Amendment. *Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 872. Throughout his Opinion, Justice Kennedy went to great lengths to distinguish Congress's "power to remedy" and the Court's power to define constitutional rights and "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). As Justice Kennedy stated in *City of Boerne*,

Congress' power under § 5, however, extends only to "enforcing" the provisions of the Fourteenth Amendment ... The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is.

*City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157.

The *Freedom Baptist Church of Delaware County* court found this to be a crucial difference going back to *Marbury*. If Congress could by statute redefine the content of constitutional provisions, *Marbury's* distinction between the Constitution as "superior paramount law" and "ordinary legislative acts" would be obliterated. *See Marbury*, 5 U.S. at 177, 1 Cranch 137 (quoted in *City of Boerne*, 521 U.S. at 529, 117 S.Ct. 2157). As Justice Kennedy stated, "any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law." *City of Boerne*, 521 U.S. at 527, 117 S.Ct. 2157.

The Court recognized that the distinction it was making based upon *Marbury* "hardly supplied a bright line for Courts." *Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 873. In Justice Kennedy's words,

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect.

*City of Boerne*, 521 U.S. at 519–20, 117 S.Ct. 2157.

The fatal flaw with RFRA was, in the Majority's view, that the statute "appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532, 117 S.Ct. 2157. Quoting from the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the Court noted that "[r]emedial legislation under § 5 'should be adapted to

---

*Madison v. Riter*, 240 F.Supp.2d 566 (W.D.Va. 2003). Further, our research has uncovered two district court cases which have ruled on the constitutionality of RLUIPA as that statute deals with protection of land use as religious exercise. *See Freedom Baptist Church of Delaware County*, 204 F.Supp.2d 857 (holding that RLUIPA is constitutional); *Elsinore Christian Ctr.*, 270 F.Supp.2d 1163 (declaring 42 U.S.C. § 2000cc(a), as applied in § 2000cc(a)(2)(C) unconstitutional). Upon review of these cases, this Court borrows much of its analysis from the *Freedom Baptist Church of Delaware County* court.

the mischief and wrong which the [Fourteenth] Amendment was intended to provide against.'" *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157. The Court further noted, by contrast, that the "RFRA is not so confined. Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.*

According to the *Freedom Baptist Church of Delaware County* court, it is precisely at this point that RLUIPA critically differs from RFRA. In limiting its applicability outside of the Spending and Commerce Clauses to those cases where governments make "individual assessments[3]," the statute draws the very line *Smith* itself drew when it distinguished neutral laws of general applicability from those "where the State has in place a system of individual exemptions," but nev-

ertheless "refuse[s] to extend that system to cases of 'religious hardship.'" *Smith,* 494 U.S. at 884, 110 S.Ct. 1595; *Freedom Baptist Church of Delaware County,* 204 F.Supp.2d at 873. "The RLUIPA thus cannot be regarded as in any way hostile to *Smith,* as the RFRA undoubtedly was." *Freedom Baptist Church of Delaware County,* 204 F.Supp.2d at 873; *see also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203 at 1221 (C.D.Cal.2002) (holding that because RLUIPA is based on the Spending and Commerce clauses, and the codification of current precedent on individualized assessments, RLUIPA would appear to have avoided the flaws of its predecessor RFRA, and be within Congress's constitutional authority).

Nor is RLUIPA hostile to *City of Boerne.* Unlike the "sweeping coverage"

---

**3.** Section 2000cc deals with "protection of land use as religious exercise" and establishes in subsection (a)(1) a "general rule" that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution—
> (A) is in furtherance of a compelling governmental interest; and
> (B) is the least restrictive means of furthering that compelling governmental interest.

Notwithstanding the breadth of this "general rule", subsection (a)(2) immediately limits the applicability of the statute to:
any case in which—
(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.
So limited, the statute then, in subsection (b), imposes four proscriptions:
(b) DISCRIMINATION AND EXCLUSION—
(1) EQUAL TERMS.—No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
(2) NONDISCRIMINATION.—No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
(3) EXCLUSIONS AND LIMITS.—No government shall impose or implement a land use regulation that—
(A) totally excludes religious assemblies from a jurisdiction; or
(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

of the RFRA that ensured that statute's "intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matters," *City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157, "the RLUIPA here is targeted solely to low visibility decisions with the obvious— and, for Congress, unacceptable—concomitant risk of idiosyncratic application." *Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 873–74. The *Freedom Baptist Church of Delaware County* court further reasoned that since RLUIPA's limitations and proscriptions codify firmly-established Supreme Court rights under its Free Exercise and Equal Protection jurisprudence, *see id.* at 870–72, it does not "attempt a substantive change in constitutional protections," that led to the demise of RFRA in *City of Boerne.* The new statute thus honors *Marbury's* distinction between the Constitution as "superior paramount law" and "ordinary legislative acts." *Id.* at 874.

Finally, to the extent that RLUIPA may cover a particular case that is not on all fours with an existing Supreme Court decision, "it nevertheless constitutes the kind of congruent and, above all, proportional remedy Congress is empowered to adopt under § 5 of the Fourteenth Amendment." *Id.* In fact, the Supreme Court noted four years after *City of Boerne* that, "congress is not limited to mere legislative repetition of this Court's constitutional jurisprudence, but may also prohibit 'a somewhat broader swath of conduct.'" *Bd. of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). And thus, unlike RFRA, RLUIPA does not "contradict[ ] vital principles necessary to maintain separation of powers and the federal balance." *City of Boerne*, 521 U.S. at 536, 117 S.Ct. 2157. We therefore conclude that RLUIPA does not exceed Congress's power under Section 5 of the Fourteenth Amendment.

## C. RLUIPA and the Commerce Clause

■ Defendants also challenge the constitutionality of RLUIPA as violative of the Commerce Clause. In the Commerce Clause dimension, Congress's power over economic activity remains extraordinarily broad. The Supreme Court in *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) delineated a bright line between the exercise of Congress's Commerce Clause power in criminal cases versus its application in those acts involving regulation of economic activity. Quoting with approval its statement in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce," *Morrison* stressed that, "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case." *Morrison*, 529 U.S. at 610, 120 S.Ct. 1740. *Morrison* then left no doubt that the economic regulatory regime inaugurated in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), remains very much alive: "*Lopez's* review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *Morrison*, 529 U.S. at 611, 120 S.Ct. 1740 (citing *Lopez*, 514 U.S. at 559–60, 115 S.Ct. 1624); *see also Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 867.

■ We conclude that plaintiff's activities in operating an orthodox Jewish day school is an economic endeavor within the meaning of the Commerce Clause. *See U.S. v. Grassie*, 237 F.3d 1199, 1209–10 (10th Cir.2001) (holding that religion and, in particular religious buildings actively used as the site for a full range of activities, easily falls within the holding of *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 584, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) that the Commerce Clause applies to charitable and nonprofit entities because they are major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues (including voluntary revenues) interstate, and so on); *United States v. Ballinger*, 312 F.3d 1264, 1282 (11th Cir.2002) (holding that "[c]hurches are institutions that facilitate the interchange of ideas, goods and services across a religious community that may span multiple states, as well as between that community as such and the outside world. This is paradigmatic 'commerce.' ").

Moreover, as subsection (a)(2)(B) on its face has an interstate commerce jurisdictional element, defendants are reduced to questioning the Congressional findings here, just as the Supreme Court did in *Morrison*, 529 U.S. at 614–16, 120 S.Ct. 1740. *See Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 867. However, as the *Freedom Baptist Church of Delaware County* court observed,

> Whatever the true percentage of cases in which religious organizations have improperly suffered at the hands of local zoning authorities, we certainly are in no position to quibble with Congress's ultimate judgment that the undeniably low visibility of land regulation decisions may well have worked to undermine the Free Exercise rights of religious organizations around the country.

*Id.*

We therefore hold that RLUIPA is a permissible exercise of Congress's broad power to act under the Commerce Clause.

## D. *Establishment Clause*

■ Defendants next charge that RLUIPA violates the Establishment Clause. The Establishment Clause of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion ...." U.S. CONST. amend. I. In the seminal case, *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established a three-prong test to determine if there is a violation of the Establishment Clause (the "Lemon Test"). The Lemon Test provides that: (1) the statute must have a secular legislative purpose; (2) the statute's principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster an excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105. Defendants argue that RLUIPA fails under the Lemon Test. We disagree. The Lemon Test and the Establishment Clause call for neutrality. *Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) ("Necessarily, the constitutional value at issue is 'neutrality.' "). RLUIPA is neutral. It does not favor one religion over any other but applies equally to all religions. *See Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (holding that a rule that applies equally to all religions offends neither the Free Exercise Clause nor the Establishment Clause). Accordingly, the Court concludes that RLUIPA does not violate the Establishment Clause.

### E. *Tenth Amendment*

██ Finally, defendants challenge the constitutionality of RLUIPA under the Tenth Amendment. The Tenth Amendment of the United States Constitution provides that "the powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively, or the people." U.S. CONST. amend. X. In light of our above analysis concerning the Commerce Clause, defendants' argument fails. The Supreme Court has explained that "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States."); *see also United States v. Jones*, 231 F.3d 508, 515 (9th Cir.2000) ("[I]f Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment."). As explained above, RLUIPA is a valid enactment pursuant to Congress's powers under the Commerce Clause and Section 5 of the Fourteenth Amendment and therefore does not violate the Tenth Amendment. *See Mayweathers v. Terhune*, 2001 WL 804140, at *7 (E.D.Cal. July 2, 2001).[4]

### III. *RLUIPA*

Having established the constitutionality of RLUIPA, we turn now to the issue of whether WDS has made a *prima facie* case that RLUIPA has been violated. To make such a showing, plaintiff must present evidence that defendants' conduct in denying the Application (1) imposes a substantial burden; (2) on the "religious exercise;" (3) of a person, institution or assembly. 42 U.S.C. § 2000cc(a)(1).[5] If the plaintiff makes this prima facie showing, the burden shifts to the local government to demonstrate that the land use regulation is the least restrictive means of furthering that compelling interest. *Id.* at (A)-(B).

██ The Supreme Court has articulated the substantial burden test differently over the years. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Lyng*, the Supreme Court stated that for a governmental regulation to substantially burden religious activity, it must have a tendency to coerce individuals into acting contrary to their religious beliefs. 485 U.S. at 450–51, 108 S.Ct. 1319; *see also Thomas*, 450 U.S. at 717–18, 101 S.Ct. 1425 (holding that a substantial burden exists where the government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . ."). Conversely, a government regulation does not substan-

---

4. Defendants' argument that "zoning and land use has long been recognized as a power given to the states and its officials . . ." (Defs. Mem. Opp. Summ J. at 19.) is undermined by Congress's broad power under the Commerce Clause. *See Freedom Baptist Church of Delaware County*, 204 F.Supp.2d at 867 ("[T]he mere fact that zoning is traditionally a local matter does not answer Congress's undoubt-

edly broad authority after *Wickard* to regulate economic activity even when it is primarily intrastate in nature."). Additionally, we have already addressed defendants' alternative Tenth Amendment argument. *See* discussion *infra* Part II. B.

5. Defendants challenge only the substantial burden element of plaintiff's RLUIPA claim.

tially burden religious activity when it has only an incidental effect that makes it more difficult to practice the religion. *Id.; Thiry v. Carlson,* 78 F.3d 1491, 1495 (10th Cir.1996). Thus, for a burden on religion to be substantial, the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient. *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995); *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996). District court cases interpreting RLUIPA since its enactment delineate the difference between a "substantial burden" on religious exercise as opposed to an "inconvenience" on religious exercise. Consistent with the Supreme Court's substantial burden test, district courts have concluded that the regulations must have a "chilling effect" on the exercise of religion to substantially burden religious exercise. *Murphy v. Zoning Comm'n of Town of New Milford,* 148 F.Supp.2d 173, 188–89 (D.Conn.2001). WDS has met the substantial burden test here.

In *Cottonwood,* the court found that the city of Cypress's zoning and eminent domain actions substantially burdened the plaintiff-church's exercise of religion in violation of RLUIPA because the plaintiff was unable to practice its religious beliefs in its current location. *Cottonwood Christian Ctr.,* 218 F.Supp.2d at 1226. The court reasoned, "Simply put, its Los Alamitos facility cannot handle the congregation's large and growing membership, and its small quarters prevent Cottonwood from meeting as a single body, as its beliefs counsel." *Id.* This is essentially the same reasoning WDS employs in support of their argument that defendants have substantially burdened their exercise of religion. WDS states that their existing facilities, some more that a century old, are inadequate for activities plaintiff deems necessary for its educational and religious mission.[6] (Pl. Mem. Supp. Summ. J. at 12.) A brief summary of WDS's proposed changes to its facilities will suffice. WDS proposes to construct "Gordon Hall" to provide the school with many of the basic facilities it currently lacks, including a *shul* [chapel] where students and staff can pray, modern classrooms with space for technological and other equipment essential for contemporary teaching methods, a library, a music room, an art room, separate speech therapy and other small group instruction rooms, and a cafeteria that will no longer have to share space with theatrical and other educational events. The additional classrooms will also enable the school to have smaller classes that are more conducive to learning, to allocate more rationally the space among the preschool, elementary school and middle school grades and to separate administrative functions from educational activities. (*Id.* at 12–13; Hammerman Aff. ¶ 8.)

According to plaintiff, the construction of Gordon Hall will also enable WDS to renovate the Estate House and Wolfson Hall. WDS plans to decommission all 13 classrooms in the Estate House, which were converted from living space in the nineteenth century home, are relatively small, irregularly shaped and not originally designed for educational instruction, and to use them instead for other essential school functions such as library space, computer rooms and administrative offices. One of the rooms in the Estate House will also be

---

**6.** According to WDS, although the school population has more than doubled since Wolfson Hall was built in the 1960s, no meaningful new construction (i.e., other than interior maintenance and renovation) has been done by plaintiff in nearly 40 years. (Hammerman Aff. ¶ 3.)

turned into a *beit midrash* [library and study center] dedicated to Jewish scholarship. Such renovations will also include making both buildings handicap accessible, creating a second science laboratory, retreading staircases, retiling bathroom floors, recarpeting rooms, rewiring for computer and network capability, and installing new doors, light fixtures and audio-visual equipment. (Pl. Mem. Supp. Summ. J. at 13; Hammerman Aff. ¶¶ 9–10.)

The structure of the Estate House will also be reinforced and strengthened, which is crucial because, since 1998, the building has been supported by four tubular steel columns extending its entire interior height that were installed on the recommendation of a structural engineer. WDS has been trying to get the Application approved and Gordon Hall built so that it could decommission the classrooms in the Estate House due to concerns about the structural integrity of this century old building. (Pl. Mem. Supp. Summ. J. at 13; Hammerman Aff. ¶ 10.) [7]

█ The Fourth Circuit's decision in *Ehlers–Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283 (4th Cir.2000), is instructive in determining the urgency of WDS's proposed changes. There the plaintiff homeowners who lived across from a Roman Catholic school constructing improvements and additions to the school without obtaining a "special exception," challenged the constitutionality of a local county zoning ordinance which exempted such schools from the special exception requirement. *Id.* at 284. The school's construction plans sought to remove two existing structures, as well as several trailers, and to construct a 300,000–square–foot, two-story building to contain classrooms, a library, facilities for music and art programs, and other educational areas. The plans also provided for the construction of additional parking areas. *Id.* at 285. In upholding the constitutionality of the local zoning ordinance, the Fourth Circuit stated, "The very existence of the school is premised on a religious mission. And necessary to the fulfillment of this mission is the existence of facilities which [the school] deems adequate to carry on its religious instruction." *Id.* at 290–91. Similarly, we find WDS's proposed modifications to be both necessary and legitimate changes in furtherance of plaintiff's religious mission of educating students with a dual curriculum of secular and Judaic studies, making defendants' complete denial of plaintiff's Application a substantial burden on their exercise of religion.

Defendants charge that WDS has failed to demonstrate how the Village is substantially burdening their exercise of religion where the students at WDS have been, and continue to be, able to gather to pray and be educated just as they did before WDS applied for a modification of a special use permit. (Defs. Mem. Opp. Summ. J. at 23.) Defendants' argument misses the point. In *Murphy*, a similar argument was dismissed. There the court rejected defendants' contention that the burden was not substantial because the purpose of plaintiff's prayer group sessions was fulfilled as long as there were "two or more people present." 148 F.Supp.2d at 188. It is the burden on the quality of the religious education that concerns us here. While it is true that the students of WDS may still, without the special permit modification gather to pray and be educated, their religious experience is limited by the current size and condition of the school

---

**7.** WDS's religious mission seeks, in part, to instill in its students the love of God and to instruct them in the Torah, Jewish rituals, morals and practices, and the land and people of Israel through a dual curriculum of secular and Judaic studies. (Complt.¶ 2.)

buildings. *See Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (stating that a substantial burden on a person's religious freedom is placed on him or her when the government's action "prevent[s] him or her from engaging in conduct or having a religious experience which the faith mandates."). Moreover, WDS, should be able, within reason, to accommodate the growing number of students who wish to pursue a Jewish education at WDS. *See Cottonwood Christian Ctr.,* 218 F.Supp.2d at 1226.

A *prima facie* case that RLUIPA has been violated having been established, the burden now shifts to defendants to demonstrate that the land use regulation furthers a compelling government interest and that the land use regulation is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000c(a)(1)(A)-(B). At the outset, the Court notes the extreme difficulty in carrying this burden. *See Cottonwood Christian Ctr.,* 218 F.Supp.2d at 1227–28 (quoting *City of Boerne,* 521 U.S. at 534, 117 S.Ct. 2157 (recognizing the difficulty for local governments in carrying their burden under RLUIPA, because requiring the government "to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law.")).

We turn now to the two major concerns raised by defendants in their opposing papers as reasons for denying WDS's Application—traffic and parking. With respect to the issue of traffic intensity, the Court extensively discussed this issue in its prior Order, and concluded that it was not a sufficient reason for the ZBA's reversal of its negative declaration of environmental impact. *See Westchester Day School,* 236 F.Supp.2d at 356–58.[8] We are unpersuaded by the opinions of additional experts relied on by defendants (since the ZBA's initial study of the potential adverse effects on traffic) which call into question the validity of WDS's traffic study. (Defs. Mem. Opp. Summ. J., Exs. H, M at ¶ 8.) In any event, traffic concerns have never been deemed compelling government interests. *See Transportation Alternatives, Inc. v. City of New York,* 218 F.Supp.2d 423, 438 (S.D.N.Y.2002) (citing *Whitton v. City of Gladstone,* 54 F.3d 1400, 1408 (8th Cir.1995) (holding that a municipality's asserted interests in traffic safety and aesthetics, while significant, have never been found compelling)); *Love Church v. City of Evanston,* 671 F.Supp. 515, 519 (N.D.Ill.1987) ("While traffic concerns are legitimate, we could hardly call them compelling."). We find defendants' second concern, parking, even less compelling. Defendants' denial of the Application based on an insufficient number of parking spaces is severely undermined by the joint request of both the Westchester County Planning Board and by the ZBA to *decrease* the number of parking spaces provided for in the Application. (Divney Aff., Exs. 4, 5.) Moreover, we find nothing to suggest that the lack of parking spaces provided in plaintiff's Application will result in a direct and immediate threat to public health, safety or welfare. *See Wisconsin. v. Yoder,* 406 U.S. 205, 215, 92

---

**8.** There we found that the issue of traffic impact had been fully considered, with the then chairman of the ZBA stating that "any further study on the impact from traffic would not give the ZBA anything additional upon which to base its decision." *Westchester Day School,* 236 F.Supp.2d at 356–58. We further noted the conclusion of the ZBA's own planning consultant who, at the ZBA's request, reviewed the Application and the traffic numbers, and who advised the ZBA that he had no disagreements with WDS's conclusions. *Id.* at 357.

S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert*, 374 U.S. at 406, 83 S.Ct. 1790.[9]

## CONCLUSION

RLUIPA provides that "[a] person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc–4(a). We again emphasize our reluctance to act as a zoning board of appeals to review land use determinations. However, we are firmly convinced that defendants' complete denial of WDS's Application was not based on any compelling governmental interest or on a fair balancing of environmental concerns with the rights to WDS to the reasonable use of its property and that defendants' abrupt reversal of its prior approval and its 3–2 vote to deny plaintiff's Application was a reaction to belated public outcry, a paradigm of what has been referred to as the NIMBY (Not In My Back Yard) syndrome. We find little rational basis for such community opposition in light of the nature and publicly beneficial purpose of the project as well as the great lengths to which WDS has gone to ensure that its physical plant will maintain the highest level of architectural and aesthetic quality.[10] *See generally Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342 (2d Cir.2003) (commenting on the benefits to the welfare of the community churches provide). In support of the Application, WDS prepared and submitted, among other things, a full Environmental Assessment Form, supplemented by comprehensive analyses and extensive studies of all relevant potential environmental impacts of the project, including but not limited to, impacts on traffic, drainage, stormwater management, utilities, aesthetics and lighting.[11] Despite these efforts, defendants have denied plaintiff's Application, a project in development for over three years, in its entirety. We conclude that this denial is a substantial burden on plaintiff's exercise of religion because the modifications WDS seeks will enable it, for well into the foreseeable future, to more efficiently, effectively and, most importantly, safely serve its student population and to fulfill its religious and educational mission.

We are convinced that there are no issues of material fact requiring a trial,

9. In light of our conclusion that defendants' concerns do not rise to the level of compelling governmental interests, the Court need not consider whether less restrictive means might have been available. However, we fail to see how the complete denial of plaintiff's Application was the proper measure in light of defendants' concerns. For example, an obvious solution to the insufficient parking issue would have been to simply require additional parking spaces.

10. The Court has been favorably impressed by the presentations made by WDS counsel during prior conferences. Specifically, their plans and drawings indicate that the design of the new building (Gordon Hall) will be in harmony with the buildings with which it will connect. It will have a stone and brick exterior, a shingle roof and copper detailing and will be screened by existing and proposed trees, fencing and vegetation. It will be only two stories in height, consistent with most of the residences in the surrounding area. At its closest point, Gordon Hall will be set back at least 25 feet from the nearest property line and 117 feet from the nearest house. Even after the construction, the property will remain largely undeveloped, with building coverage of only approximately 7.5% of the 27.5–acre property. (Hammerman Aff. ¶¶ 4–6, Ex. C.)

11. On January 10, 2003, a conference was held before this Court, during which the Court directed the ZBA to give WDS a list of outstanding issues that were of concern to the ZBA and that might impede the issuance to WDS of the special permit modification. The ZBA provided WDS with its issues list on January 17, 2003 and WDS promptly responded to each issue on January 30, 2003. (Hammerman Aff., Ex. C.)

which would not only impose substantial economic burdens on both the plaintiff and the Village of Mamaroneck but would long delay the improvements of plaintiff's physical plant which are necessary to the effective pursuit of its worthy aims. We therefore grant plaintiff's motion for partial summary judgment on its RLUIPA claim and in doing so annul and set aside the May 13, 2003 determination of the ZBA that denied the Application and order the immediate and unconditional approval and granting of WDS's application that was filed with the ZBA on October 10, 2001 as amended on June 17, 2002.

SO ORDERED.